## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - x
                                    :
In re:                              :        Chapter 11
                                    :
BNA SUBSIDIARIES, LLC[1]            :        Case No. 10-___ (___)
                                    :
                                    :
                Debtor.             :
- - - - - - - - - - - - - - x

## DECLARATION OF BRADFORD SMITH, CHIEF OPERATING OFFICER
## OF BNA SUBSIDIARIES LLC, IN SUPPORT OF
## CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Bradford Smith, being duly sworn, deposes and says:

1.   I am the Chief Operating Officer of BNA Subsidiaries, LLC, a limited liability company organized under the laws of the state of Delaware ("Subsidiaries" or the "Debtor").  I am authorized to submit this Declaration in support of the Debtor's chapter 11 petition and the first day pleadings described herein.[2]

2.   I am familiar with the Debtor's day-to-day operations, business affairs, and books and records. I have also reviewed the Debtor's "First Day Motions and Orders" and am familiar with the facts alleged therein and relief requested.

---

[1]  The last four digits of the Debtor's federal tax identification number are 5412.

[2]  Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion (defined below).

Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees or retained advisers that report to me in the ordinary course of my responsibilities as Chief Operating Officer and, if called as a witness, would testify thereto.[3]

## A. The Bankruptcy Case

3.    On the date hereof (the "Petition Date"), Subsidiaries commenced a case by filing a petition for relief in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## B. The Debtor's Corporate Structure

4.    Subsidiaries is a wholly-owned subsidiary of The Bureau of National Affairs, Inc. ("BNA"), a non-debtor, which in turn owns eight (8) other non-debtor affiliates of Subsidiaries. BNA is the largest independent publisher of information and analysis products for professionals in business and government. It publishes – in print and electronic formats – more than 350 daily, weekly, monthly, and up-to-the-minute news services covering the full range of legal, legislative, regulatory, and

---

[3]    Certain of the disclosures herein relate to matters within the knowledge of other employees of the Debtor and are based on information provided by them.

economic developments that impact the business environment around the nation and the world.

5.    BNA is wholly employee-owned company and has been since 1947.  Subsidiaries has no subsidiaries of its own.

## C.    The Debtor's Business and Recent Performance

6.    Based in Peterborough, New Hampshire, the Debtor was formed on January 1, 2009 through the merger of Kennedy Information, Inc. ("Kennedy") and the Institute of Management and Administration, Inc. ("IOMA").  Kennedy and IOMA were two independent entities acquired by BNA in 2000 and 1997, respectively.

7.    The Debtor employs approximately 111 employees, 104 of whom are classified as full-time employees and 7 of whom are classified as part-time employees.  Approximately 90% of all employees are salaried personnel and the remaining 10% are hourly wage earners.

8.    As of July 17, 2010, the Debtor's books and records reflected total combined assets of approximately $2.2M (book value excluding goodwill) and total combined liabilities of approximately $6.1M (excluding deferred income taxes).  Notwithstanding the substantial efforts of the Debtor and its employees, for the fiscal year ending December 31, 2009, the Debtor generated revenues of approximately $23,154,540 but incurred net operating losses of approximately $1,820,427.

3

**(i)  IOMA**

9.    IOMA was established in 1983 with a single
newsletter – Law Office Management and Administration Report.
When BNA acquired IOMA, in 1997, it published approximately 25
newsletters providing news and analysis for specific business to
business segments.  At that time, newsletter subscriptions and
list rentals produced virtually all of its revenues.  The market
for monthly printed newsletters began to decline between 2000
and 2005, and by 2005, IOMA had abandoned several newsletter
publishing markets and reduced its workforce substantially.  A
variety of forces caused this decline, but two were particularly
damaging: the first, an industry-wide direct mail marketing
trend-rising cost of mailing and declining returns on mailed
solicitations, and the second, the constantly increasing amount
free information available on the Internet.  IOMA began
publishing research reports, producing more live conferences,
and producing topical audioconferences.  Newsletter
subscriptions, by the end of 2007, accounted for only 64% of
revenues.  Unfortunately, however, the overall number of
subscribers for its remaining publications continued to decline;
and these new revenue sources, while relatively successful,
could not make up for the lost revenue, and they had relatively
higher marketing costs.  In 2007, the company developed a plan
to  move out of Manhattan, where it had been since it was

4

founded.  The company moved approximately 70 employees to
Newark, NJ in March of 2008 and reduced its office space from
approximately 24,000 square feet to approximately 12,000 square
feet, also halving the per-square-foot rental cost compared to
the cost of renewing in the Manhatten location.

10.  The IOMA division is based in New Jersey and has
43 employees most of whom work in one of the company's corporate
offices in New Jersey, Maryland or New York, though some work
out of their homes.

**(ii) Kennedy**

11.  Kennedy was founded in 1970, based on a single
newsletter covering the executive recruiting profession.  By
2000, when BNA acquired it, Kennedy Information served
professionals in executive recruiting, management consulting,
and investor relations, publishing 8 newsletters, 2 magazines,
and in-depth research reports.  It also produced several live
conferences for executive recruiters, corporate recruiters, and
management consultants.

12.  The downturns of 2001-2003 and the current
recessionary climate adversely affected Kennedy's recruiting and
investor relations clients.  In turn, Kennedy's business to
those customers declined sharply.  Kennedy shut down several
newsletters, sold its corporate recruiting and investor
relations assets and closed down its services to executive

5

recruiters. While also impacted by the downturns, Kennedy's

products and services to the management consulting profession

remain viable. Kennedy has become, and remains, the leading

research firm for that industry, producing more than 20 research

reports, the leading industry magazine, Webinars and live events

each year.

13. The Kennedy division is based in New Hampshire

and has 68 employees.

**D.     The Debtor's Capital Structure**

14. The Debtor's capital structure consists of

unsecured debt owed to BNA and other parties as well as

membership interests held solely by BNA. Specifically, the

Debtor owes BNA approximately $2.0 million as of the Petition

Date and estimates that it owes approximately $600,000 to trade

creditors. Subsidiaries has no secured debt.

**E.     Events Leading to the Filing of the Chapter 11 Case**

15. The economic downturn that began in the second

half of 2008 had a disproportionately negative effect on the

publishing industry as well as several of the IOMA and Kennedy

brand product lines. Markets for information and meetings for

corporate recruiters, and publications of all types aimed at

functional departments in corporations were particularly

depressed. On January 1, 2009, BNA combined the Kennedy and

IOMA subsidiaries into a newly formed BNA Subsidiaries, LLC.

6

The aim was to reduce operating costs and rationalize both management and shared services across the two organizations. As publishing demand continued to deteriorate, BNA and the Debtor began conducting a comprehensive review of their business operations and strategic alternatives and, near the end of 2009, adopted and began to implement an out-of-court strategic restructuring plan.

16. As part of the plan, the Debtor discontinued, transferred or sold several products and product lines in an effort to create a more focused and profitable company that serves vertical industry markets with high quality information services. Specifically, at the end of 2009, the Debtor transferred the assets of the following three business units to BNA: the former IOMA Human Resources and Payroll business unit, the Pike & Fisher Telecommunications unit, and the Pike & Fisher Legal and Regulatory unit. The IOMA Human Resources publishing business had been declining in revenue and profit due to the emergence of the Society of Human Resource Management (SHRM) as a more formidable publishing competitor. IOMA lacked the sales and marketing resources to effectively compete. Additionally, several of the Payroll and the Pike and Fisher publications were loose leaf binder publications and IOMA was moving to a lower priced publishing platform that would no longer support those publications. These product lines fit well with BNA's

7

publishing platform and its field sales force.  So, IOMA
transferred these products to BNA in exchange for fulfillment
liabilities and a transfer of balance sheet goodwill.  The
Debtor continued and intends to continue to provide transition
services to BNA until the product lines and operations are
integrated into BNA's existing editorial, production, and
distribution functions for which BNA reimburses Subsidiaries on
a cost plus basis.  Additionally, during 2009, the Debtor sold
the former Kennedy Investor Relations and Corporate Recruiting
business assets, and the former IOMA Corporate Finance business
assets.  It also discontinued its Executive Recruiting business
unit.

     17.  Furthermore, the Debtor made numerous facility
and employment changes in New Hampshire and New Jersey with the
goal of consolidating most of the Debtor's operating functions
in New Hampshire during 2010.  Today, only ten (10) employees
work full-time at the Newark office.

     18.  In addition, the Debtor is a party to four (4)
leases of non-residential real property in New Hampshire, New
York, New Jersey and Maryland.  The Debtor is currently
considering its options with respect to the New Jersey, New York
and New Hampshire leases.  The New Jersey and New York leases,
in their current terms, pose financial and operational burdens
on the Debtor.

8

19.  Notwithstanding the implementation of the strategic restructuring plan, the Debtor continues to experience financial losses and continues to incur expenses that are beyond its ability to self fund and that negatively affect its financial performance.  While such operating losses had historically been funded by BNA, shortly before the filing the Debtor was informed by BNA that BNA would no longer provide unsecured funding and/or equity infusions in light of, among other things, market weakness for the Debtor's products and product lines.

20.  Furthermore, the Debtor's funding needs were expected to increase as a result of the substantial cost it was likely to incur in defending itself in certain class action litigation commenced in November, 2009.  The class action litigation seeks recovery in an amount over $15M for claims allegedly arising from the transmission of marketing facsimiles by Subsidiaries in violation of the Telephone Consumer Protection Act.

21.  Although Subsidiaries intends to vigorously defend against the class action lawsuit, the costs associated with the Debtor's defense against the class action litigation are expected to be substantial and with no assurance of success. In the event that the Debtor was ultimately unsuccessful in defending the class action litigation, a judgment for the

9

plaintiffs in the class action would have had a material adverse effect on the continued viability of the Debtor as a going concern.

22. In addition, the Debtor is defending against litigation filed by one of its former independent contractors alleging damages for the wrongful denial of benefits and alleged improper payment of Subsidiaries' share of taxes for FICA and Medicare.

23. Thus, faced with the possibility that it would no longer be able to continue as a going concern for the many reasons identified above, the Debtor began to consider various additional restructuring alternatives, including discontinuing additional operations, further sales or transfers of products or product lines and/or the commencement of a chapter 11 reorganization case.

**F.   Objectives Of The Chapter 11 Filing**

24. The Debtor commenced this Chapter 11 case to obtain access to additional financing to fund its go forward operations and, with that much needed funding, utilize the benefits of the automatic stay and other Bankruptcy Code protections to assess creditor claims and explore any and all restructuring alternatives in an orderly fashion. Specifically, within the first few weeks of the commencement of this case, the Debtor intends to file a plan of reorganization and related

10

disclosure statement. In addition, the Debtor will seek to establish a bar date for filing prepetition claims against the Debtor so that the Debtor can adequately assess its prepetition liabilities. All in all, the Debtor anticipates emerging from bankruptcy in early 2011.

## I.    FIRST DAY MOTIONS AND ORDERS

25. In furtherance of these objectives, the Debtor expects to file a number of first day motions (the "First Day Motions") and proposed orders, each as listed on the attached Exhibit A, and respectfully requests that the Court consider entering the proposed orders granting such First Day Motions. I have reviewed each of the First Day Motions and Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving the Debtor's successful reorganization.

## A.    Motion to Retain Logan & Company, Inc. as Claims, Noticing and Balloting Agent

26. The Debtor has filed a motion seeking to have Logan & Company, Inc. ("Logan") retained as the claims, noticing

11

and balloting agent in this bankruptcy case (the "Logan Retention Motion"), under the terms and conditions of the agreement dated September 20, 2010 between the Debtor and Logan, subject to any restrictions set forth in the proposed order approving the Logan Retention Motion.

27.  I have been advised that Local Rule 2002-1(f) requires such appointment.  Moreover, such relief is prudent in light of the significant number of creditors, potential creditors and parties-in-interest to whom certain notices will be sent.  Accordingly, I believe that the most effective and efficient manner by which to give notice and provide solicitation services in this case is to engage an independent third party to act as agent of the Court.

28.  I further believe that the relief requested in the Logan Retention Motion is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and will enable the Debtor to continue to operate its business in chapter 11 without disruption.

29.  Accordingly, on behalf of the Debtor, I respectfully submit that the Logan Retention Motion should be approved.

**B.  Motion to Continue Certain Banking and Business Practices**

30.  The Debtor has filed a motion that seeks entry of an order authorizing, but not directing (a) maintenance of

12

existing bank accounts, and authorizing a waiver of certain operating guidelines relating to bank accounts set forth in the U.S. Department of Justice, Office of the United States Trustee: Guidelines for Debtors-in-Possession as adopted by the Office of the United States Trustee for the District of Delaware, (b) continued use of existing business forms, (c) continued use of existing cash management system, and (d) the continuation of intercompany transactions with BNA and other non-debtor affiliates. In addition, the Debtor seeks to confer administrative expense status for certain intercompany transactions with BNA and other non-debtor affiliates and a waiver of the requirements of 11 U.S.C. § 345(b) on an interim basis (collectively, the "Cash Management Motion").

31. In that regard, I understand that the Debtor maintains four (4) bank accounts out of which it manages cash receipts and disbursements, a list of which are attached as Exhibit A to the Cash Management Motion (the "Bank Accounts"). I believe that all of the Bank Accounts are in financially stable banking institutions, and are fully insured by FDIC insurance (up to an applicable limit per financial institution) and make up an established cash management system that the Debtor needs to maintain, in my opinion, in order to ensure smooth collections and disbursements in the ordinary course of business.

13

32.   In my opinion, the cash management procedures utilized by the Debtor constitute ordinary, usual and essential business practices and are similar to those used by other similarly-sized corporate enterprises.  The Debtor's cash management system is highly automated.  This allows the Debtor to centrally manage all of its cash flow needs and includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  I believe that the Debtor will continue to maintain detailed records reflecting all transfers of funds.

33.   Requiring the Debtor to alter its banking and business practices, including its use of numerous business forms (including, without limitation, letterhead, purchase orders, invoices, contracts and checks) would, I believe, cause enormous disruption in the Debtor's business and would impair the Debtor's efforts to reorganize and pursue other alternatives to maximize the value of its estate.  Moreover, such actions would be expensive, unnecessary and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor. Consequently, I believe that maintenance of the existing cash management system and other banking and business practices, as requested in the Cash Management Motion, during this chapter 11

14

case is in the best interests of all creditors and other parties in interest.

34. In addition, in the ordinary course of the Debtor's business, the Debtor engages in intercompany transactions with BNA and other non-debtor affiliates (collectively, the "Intercompany Transactions"). The Intercompany Transactions cover a variety of items, including, without limitation, Intercompany Transactions between BNA and the Debtor concerning intercompany payables and/or receivables related to Direct Costs, Allocated Costs and Transition Services (as defined in the Cash Management Motion), as well as Intercompany Transactions between the Debtor and McArdle Printing Company, Inc. ("McArdle"), a non-debtor affiliate, concerning printing services provided to the Debtor. The Intercompany Transactions are reflected in the individual entities' books.

35. By the Cash Management Motion, the Debtor seeks authority to continue the Intercompany Transactions with BNA and McArdle, and requests that Intercompany Claims arising after the Petition Date as a result of an Intercompany Transaction between the Debtor and BNA related to Direct Costs, Allocated Costs or Transition Services, and Intercompany Claims between the Debtor and McArdle be accorded administrative priority expense status

pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code.

36.    Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

**C.    Motion to Pay Prepetition Wages and Salaries of Employees and Independent Contractors and Satisfy All Payroll, Employee Benefit and Related Obligations**

37.    The Debtor has also filed a motion seeking authorization to pay prepetition wages, salaries, bonuses, reimbursements, and other compensation, to continue the maintenance of employee benefit programs in the ordinary course of business, continue to pay and/or perform, as applicable, all obligations to the Debtor's independent contractors and directing all banks to honor prepetition checks and fund transfers for payment of prepetition employee independent contractor obligations (the "Employee Motion").  I believe that without payment of these employee and independent contractor obligations, the Debtor's business and operations will be detrimentally impacted through the reduction in employee morale and the potential loss of key employees and independent contractors during a critical time for the Debtor and its business.

38.    Specifically, as noted above, the Debtor's workforce is composed of full- and part-time salaried and hourly

16

employees.  The Debtor employs approximately 111 employees, 104 of whom are classified as full-time employees and 7 of whom are classified as part-time employees.  Approximately 90% of all employees are salaried personnel and the remaining 10% are hourly wage earners.

39.  These employees are all dependent on their receipt of these payments and benefits.  Moreover, I believe there are presently no employees who are owed in excess of $10,950 for prepetition wages or salaries.  Thus, it is my understanding that all of the Debtor's employees would have a priority claim with respect to all of their accrued but unpaid prepetition wages or salaries under the Bankruptcy Code.

40.  I believe the Debtor must continue to pay the outstanding amounts owed as of the date of this Declaration for accrued and unpaid wages and salaries to employees and independent contractors, including amounts that the Debtor is required by law to withhold from employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes.  I believe that if such payments are not made, employees will terminate their employment with the Debtor, at a time when the need for a well-motivated workforce is most critical, and cause significant disruption to operations. In sum, the employees and independent contractors, and their skills, knowledge and understanding of

17

the Debtor's infrastructure, operations and customer relations are essential to the effective operation and reorganization of the Debtor's business. Without continued services of the employees and independent contractors, I believe an effective reorganization of the Debtor will not be possible.

41. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Motion should be approved.

**D.  Motion to Provide Utility Companies with Adequate Assurance of Payment**

42. The Debtor has also filed a motion to provide utility companies with adequate assurance of payment and establishing procedures for additional assurance of payments (the "Utility Motion"). In connection with the operation of its business and the management of its properties, the Debtor receives utility service (the "Utility Services") from various utility companies (the "Utility Companies") covering a number of utility accounts.

43. Prior to the Petition Date, the Utility Companies provided Utility Services to the Debtor at its offices in New Hampshire, New Jersey, New York and Maryland. The services provided by the Utility Companies are crucial to the continued operation of the Debtor. Accordingly, the Debtor proposes to prepay the Utility Services one month in advance in an amount equal to the largest bill for utility consumption during the

18

last year to cover each month's maximum utility consumption (the

"Prepayment"). I believe that the procedures that the Debtor

has proposed for the Utility Companies adequately protect such

Utility Companies' rights that I understand are provided to the

Utility Companies under the Bankruptcy Code, while also

protecting the Debtor's needs for continuous and uninterrupted

Utility Services. Additionally, I believe that all postpetition

obligations owed to the Utility Companies will be paid in a

timely manner and that the Debtor will have sufficient funds

from operations and its proposed postpetition financing to

satisfy such obligations.

44. In addition, to extent that certain Utility

Companies find the Prepayment unsatisfactory and, request

additional adequate assurance of payment pursuant to section

366(c)(2) of the Bankruptcy Code, the Debtor proposes Additional

Adequate Assurance Procedures to determine whether additional

adequate assurance is required, as further outlined in the

Utility Motion.

45. I believe that the relief requested in the

Utility Motion strikes a fair balance between the rights of

Utility Companies and the rights of the Debtor under the

Bankruptcy Code and the need, for the benefit of the Debtor and

its estate, for the Debtor to continue to receive the Utility

Services upon which its business depends. I do not believe that

the Utility Companies will be prejudiced by the Prepayment, the uninterrupted continuation of the Utility Services, or the approval of the Additional Adequate Assurance Procedures.

46.  Accordingly, on behalf of the Debtor, I respectfully submit that the Utility Motion should be approved.

**E.   Motion to Continue Certain Customer Practices**

47.  The Debtor has also filed a motion for entry of an order (the "Customer Programs Motion") authorizing, but not directing, the Debtor to continue (a) to honor Customer Obligations; (b) to pay the prepetition Customer Claims; (c) to receive, process and honor credit card transactions and (d) to extend credit to certain customers in the ordinary course of business (collectively, the "Customer Programs").

48.  The success and viability of the Debtor's business, and ultimately the Debtor's ability to successfully reorganize, are totally dependent upon the patronage and loyalty of its customers.  In this regard, the Debtor's Customer Programs, such as pre-paid subscriptions and programs to attract new advertising customers, retain existing ones, and increase advertising purchase volume, are critical, and any delay in honoring the Debtor's obligations thereunder will severely and irreparably impair customer relations.  Any failure to honor prepetition Customer Programs or pay the prepetition Customer

20

Claims, for even a brief time, may well drive away valuable customers, thereby harming the Debtor's efforts to reorganize.

49. Accordingly, on behalf of the Debtor, I respectfully submit that the Customer Programs Motion should be approved.

## F. Motion for Payment of Sales, Use and Trust Fund Taxes and Other Taxes and Related Obligations

50. The Debtor has also filed a motion seeking entry of an order, authorizing, but not directing, it to pay prepetition sales, use, personal property, franchise and foreign taxes (the "Taxes") to the respective taxing or other appropriate regulatory authorities (the "Taxing Authorities") in the ordinary course of the Debtor's business (the "Taxes Motion").

51. I have been advised that many of the Taxes constitute so-called trust fund obligations that are required to be collected from third parties and held in trust for payment to the Taxing Authorities. Consequently, the funds that would be used to pay the Taxes are not property of the Debtor's estate within the meaning of section 541 of the Bankruptcy Code.

52. Even assuming, *arguendo*, that the funds held by the Debtor for the payment of the Taxes were not held in trust, I have further been advised that payment of the Taxes would nonetheless be proper as the Taxes are either priority claims

21

pursuant to section 507(a)(8) of the Bankruptcy Code, or secured claims pursuant to section 506(a) of the Bankruptcy Code. Given the confirmation requirements under section 1129 of the Bankruptcy Code, as further detailed in the Taxes Motion, the Debtor's payment of the Taxes now only affects the timing of the payments and not the amounts to be received by the Taxing Authorities. In that regard, by paying the Taxes now, the Debtor avoids any unnecessary fees, interest, or penalties that might otherwise accrue.

53.   I believe that it is evident that the payment of the Taxes is necessary to the Debtor's effective reorganization. In particular, I submit that the payment of the Taxes is necessary in order to preserve the value of the Debtor's estate, as well as avoid the cost and expense of audits or litigation regarding the Taxes.

54.   Accordingly, on behalf of the Debtor, I respectfully submit that the Taxes Motion should be approved.

## G.    Motion for Payment of Prepetition Claims of Shippers

55.   The Debtor has also filed a motion seeking entry of an order, authorizing it, in its discretion, to pay certain prepetition claims of shippers, such as FedEx and United Parcel Service, in the ordinary course of business (the "Shippers Motion"). Without authority to make these payments, it is probable that several, if not all, of these parties will cease

22

doing business with the Debtor, thereby affecting the Debtor's shipment and delivery of goods.

56. At this critical time in the Debtor's chapter 11 case, it is important that the delivery of its products remain uninterrupted. Without this required consistency, I believe the Debtor will likely lose customers, which will severely hamper its reorganization prospects and significantly decrease the value of its estate.

57. Accordingly, on behalf of the Debtor, I respectfully submit that the Shippers Motion should be approved.

## H. Motion for Payment of Prepetition Claims of Critical Vendors

58. The Debtor has also filed a motion seeking entry of an order (i) authorizing the Debtor to pay, in its discretion a portion of the prepetition claims of certain critical vendors and; and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts paid by the Debtors under the Order whether presented prior to or after the Petition Date (the "Critical Vendor Motion").

59. Certain vendors (the "Critical Vendors") have claims for providing (1) essential goods to the Debtor that were received by the Debtor before the Petition Date and/or (ii) essential services that were rendered to, or on behalf of, the

23

Debtor before the Petition Date (collectively, the "Critical Vendor Claims"). Given the paramount importance of the goods and services provided by the Critical Vendors, and in order to ensure that the Debtor continues to receive such goods and services, I believe that it is imperative that the Debtor be permitted to pay the Critical Vendor Claims.

60. The Debtor proposes to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtor on terms that are as or more favorable to the Debtor as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtor in the twelve months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor. The Debtor further proposes to take appropriate efforts, in its discretion, to cause each Critical Vendor, as applicable, to enter into an agreement (the "Vendor Agreement") that includes the amount of such Critical Vendor's estimated pre-petition claim, memorializes the Customary Trade Terms, requires removal of any liens asserted against the Debtor or its estate, if any, all as further detailed in the Critical Vendor Motion.

61. I believe that maintaining the goods and services provided by the Critical Vendors on Customary Trade Terms and in

24

accordance with the Vendor Agreement is vital to the Debtor's continuing business operations and the success of this chapter 11 case.

62.   Accordingly, on behalf of the Debtor, I respectfully submit that the Critical Vendor Motion should be approved.

## I.   Motion for Approval of Debtor-in-Possession Financing

63.   Lastly, the Debtor seeks authority to enter into a postpetition financing agreement with BNA, whereby BNA has agreed to provide for senior secured superpriority debtor-in-possession financing (the "DIP Financing") in an amount not to exceed $1.5 million (the"DIP Financing Motion").  For the reasons set forth below, I believe that the Court's approval of the DIP Financing Motion is absolutely critical.

64.   Currently, the Debtor holds no prepetition secured debt.  The Debtor, however, does not generate sufficient revenue to operate without an outside funding source.  Prior to the Petition Date, BNA, as parent, made unsecured loans and equity investments in the Debtor through ordinary course of business intercompany transactions.  Immediately prior to the Petition Date, BNA indicated it would no longer provide the Debtor with additional working capital due to the Debtor's deteriorating financial condition, except on a first lien basis through the DIP Financing.

65. The Debtor has limited access to immediately available funds. The Debtor concluded that BNA, as the Debtor's parent, possessed unique knowledge of the Debtor's businesses and restructuring needs. BNA was identified as the most likely source of debtor-in-possession financing. Before deciding to enter into the DIP Financing, the Debtor conducted arm's-length and good-faith negotiations with BNA. The Debtor ultimately determined that the proposal for DIP Financing provided by BNA was the most favorable under the circumstances, and adequately addressed the Debtor's reasonably foreseeable liquidity needs. Through its financial advisor, the Debtor is in the process of seeking alternative financing proposals from third parties and will update the Court at the hearing to consider the First Day Motions and Orders.

66. To secure goods and services, pay employees and maintain the operation of its business as it restructures, the Debtor has an immediate need for access to additional financing under the DIP Financing. I believe that such financing will permit, among other things, the retention of employees, restoration of critical customer relationships, orderly continuation of the operation of its business and the completion of the restructuring process.

67. The Debtor, therefore, decided, in the exercise of its sound business judgment, that the DIP Financing provided

26

by BNA was the most favorable under the circumstances and best addressed the Debtor's working capital needs. The Debtor's access to the DIP Financing is necessary in order to ensure that the Debtor has sufficient working capital and liquidity to operate its business and thus preserve and maintain the going concern value of the Debtor's estate, which, in turn, is integral to maximizing recoveries for the Debtor's stakeholders.

68. Thus, I believe that entry into the DIP Financing is in the best interest of the Debtor's estate, creditors and other parties-in-interest.

69. Accordingly, on behalf of the Debtor, I respectfully submit that the DIP Financing Motion should be approved in order to facilitate a smooth and orderly transition into chapter 11 and minimize the disruption of the Debtor's business affairs.

27

I swear under penalty of perjury that the foregoing is true and correct.

Dated: Wilmington, Delaware
       September 23, 2010

                              BNA Subsidiaries, LLC,
                              Debtor and Debtor in Possession

                              _____
                              Bradford Smith
                              Chief Operating Officer

**EXHIBIT A**

**List of First Day Motions**

1.  Motion of the Debtor for Entry of an Order Authorizing
    the Retention and Employment of Logan & Company, Inc.
    as Claims, Noticing, and Balloting Agent

2.  Debtor's Motion for an Order Pursuant to 11 U.S.C. §§
    105(a), 345(b), 363 and 364, Fed. R. Bankr. P. 6003 and
    Del. Bankr. L.R. 2015-2 (I) Authorizing Continued
    Maintenance of Existing Bank Accounts, (II) Authorizing
    Continued Use of  Business Forms, (III) Authorizing
    Continued Use of Existing Cash Management System, (IV)
    Authorizing the Continuation of Intercompany
    Transactions with the Debtor's Parent Company and Non-
    Debtor Affiliates, (V) Conferring Administrative
    Expense Status for Certain Intercompany Transactions
    and (VI) Waiving the Requirements of 11 U.S.C. § 345(b)
    on an Interim Basis

3.  Debtor's Motion for Order Pursuant to Bankruptcy Code
    Sections 105(a), 363, 507(a), 541, 1107(a) and 1108 and
    Bankruptcy Rule 6003 Authorizing Debtor to Pay
    Prepetition Wages, Compensation, Employee Benefits and
    Prepetition Compensation Owed to Independent
    Contractors

4.  Debtor's Motion for Entry of an Order Pursuant to
    Sections 105(a) and 366 of the Bankruptcy Code(I)
    Approving Debtor's Adequate Assurance of Payment, (II)
    Establishing Procedures for Resolving Requests by
    Utility Companies for Additional Assurance of Payment
    and (III) Scheduling a Hearing with Respect to
    Contested Adequate Assurance of Payment Requests

5.  Debtor's Motion for Order Pursuant to Bankruptcy Code
    Sections 105(a), 363, 1107(a) and 1108 and Bankruptcy
    Rule 6003 Authorizing Continuation of Certain Customer
    Practices

6.  Debtor's Motion for Order Pursuant to Sections 105(a),
    506(a), 507(a)(8), and 541 of the Bankruptcy Code and
    Bankruptcy Rule 6003 Authorizing the Debtor to Pay
    Prepetition Sales, Use, Personal Property, Franchise
    and Foreign Taxes and Related Obligations to Certain
    International and State Governmental Entities

7.  Debtor's Motion for an Order Authorizing the Payment of Prepetition Claims of Shippers

8.  Motion of the Debtor for an Order, Pursuant to Sections 105(a) 1107 and 1008 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure, Authorizing the Payment of a Portion of the Prepetition Claims of Certain Critical Vendors

9.  Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), and 364(c)(3) and (II) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c)