# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Case No. 10-13087 (BLS) |
| | ) |
| BNA SUBSIDIARIES, LLC, | ) Chapter 11 |
| | ) |
| Debtor.[1] | ) |
| | ) |
| | ) |

## DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN OF REORGANIZATION OF BNA SUBSIDIARIES, LLC

Norman L. Pernick
Marion M. Quirk
Karen Grivner
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
500 Delaware Avenue,
Suite 1410
Wilmington, Delaware 19801
Tel: (302) 652-3131
Fax: (302) 574-2107

Counsel for BNA Subsidiaries, LLC

Dated: Wilmington, Delaware
        December 30, 2010

---

[1] The last four digits of the Debtor's federal tax identification number are 5412.

# INTRODUCTION AND DISCLAIMER

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION OF BNA SUBSIDIARIES, LLC AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

THIS DISCLOSURE STATEMENT SETS FORTH CERTAIN INFORMATION REGARDING THE DEBTOR'S PREPETITION OPERATING AND FINANCIAL HISTORY, THE NEED TO SEEK CHAPTER 11 PROTECTION, SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE, AND THE ANTICIPATED ORGANIZATION, OPERATIONS AND FINANCING OF THE DEBTOR UPON SUCCESSFUL EMERGENCE FROM CHAPTER 11. THIS DISCLOSURE STATEMENT ALSO DESCRIBES TERMS AND PROVISIONS OF THE PLAN, CERTAIN EFFECTS OF CONFIRMATION OF THE PLAN, CERTAIN RISK FACTORS, AND THE CONFIRMATION PROCESS AND VOTING PROCEDURES THAT HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN MUST FOLLOW FOR THEIR VOTES TO BE COUNTED.

EXCEPT AS OTHERWISE PROVIDED HEREIN, CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. UNLESS OTHERWISE NOTED, ALL DOLLAR AMOUNTS PROVIDED IN THIS DISCLOSURE STATEMENT AND THE PLAN ARE GIVEN IN UNITED STATES DOLLARS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT DOCUMENTS ONCE FILED, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF BNA SUBSIDIARIES, LLC, THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,

STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN BNA SUBSIDIARIES, LLC, THE DEBTOR AND DEBTOR IN POSSESSION IN THIS CASE.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ....................................................................................................................1

II.     OVERVIEW OF THE PLAN....................................................................................................2

        A.      General Structure of the Plan ....................................................................................3
        B.      Summary of Treatment of Claims and Interests under the Plan.................................4

III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES .......................................................9

        A.      Notice to Holders of Claims......................................................................................9
        B.      Voting Rights...........................................................................................................10
        C.      Solicitation Materials...............................................................................................10
        D.      Voting Procedures, Ballots, and Voting Deadline ..................................................10
        E.      Confirmation Hearing and Deadline for Objections to Confirmation......................11

IV.     GENERAL INFORMATION CONCERNING THE DEBTOR ...............................................12

        A.      Overview of Business Operations.............................................................................12
        B.      The Debtor's Corporate Structure............................................................................12
        C.      Operational Matters.................................................................................................12
        D.      Debtor's Capital Structure .......................................................................................14
        E.      Events Leading to the Filing of the Chapter 11 Case...............................................15

V.      CHAPTER 11 CASE..............................................................................................................16

        A.      Continuation of Business; Stay of Litigation ..........................................................16
        B.      First Day Orders.......................................................................................................17
        C.      Retention of Professionals........................................................................................18
        D.      Official Committee ..................................................................................................18
        E.      Post-Petition and Post-Confirmation Funding.........................................................18
        F.      Other Material Matters Addressed During the Chapter 11 Case...............................18

VI.     SUMMARY OF THE PLAN OF REORGANIZATION .........................................................19

        A.      Overall Structure of the Plan...................................................................................20
        B.      Reorganized Capital Structure Created by Plan.......................................................20
        C.      Classification and Treatment of Claims and Interests...............................................20
        D.      Preservation of Causes of Action; Resulting Claim Treatment................................26
        E.      Allowed Claims, Distribution Rights and Objections to Claims...............................27
        F.      Disposition of Executory Contracts and Unexpired Leases ......................................32
        G.      Vesting of Assets; Release of Liens, Claims and Encumbrances .............................34
        H.      Payment of General Unsecured Claims by the DIP Lender ......................................35
        I.      Sale of Subsidiaries to DIP Lender ..........................................................................35
        J.      Alternative Transaction............................................................................................35
        K.      Authorization and Issuance of New Equity..............................................................35
        L.      Restructuring Transactions.......................................................................................35
        M.      Post-Consummation Corporate Structure, Management and Operation ...................36
        N.      Releases, Discharge, Injunctions, Exculpation and Indemnification .......................37
        O.      Retention of Jurisdiction..........................................................................................40
        P.      Amendment, Alteration and Revocation of Plan......................................................42
        Q.      Plan Implementing Documents ................................................................................43

i

      R.      Confirmation and/or Consummation........................................................43

VII.    CERTAIN RISK FACTORS TO BE CONSIDERED ........................................45

      A.      General Considerations..................................................................45
      B.      Certain Bankruptcy Considerations ...............................................45
      C.      Claims Estimations ........................................................................46
      D.      Conditions Precedent to Consummation; Timing ...........................46
      E.      Inherent Uncertainty of Financial Projections ..............................46
      F.      Certain Risk Factors Relating to Securities to be Issued Under the Plan............47
      G.      Competition...................................................................................47
      H.      Litigation......................................................................................47
      I.      Adverse Publicity..........................................................................47
      J.      Certain Tax Considerations............................................................48

VIII.   APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS LAWS........................48

      A.      Exemption From Registration Requirements For New Equity....................48
      B.      Subsequent Transfers of New Equity..............................................48

IX.     CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN....................49

      A.      Certain Tax Considerations............................................................49
      B.      General..........................................................................................49
      C.      Certain U.S. Federal Tax Consequences to the
            Debtor..........................................................................................49
      D.      Certain U.S. Federal Tax Consequences to the Holders of Claims and Equity Interests.......50
      E.      Importance of Obtaining Professional Tax Assistance....................50

X.      FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ....................51

      A.      Feasibility of the Plan....................................................................51
      B.      Acceptance of the Plan...................................................................52
      C.      Best Interests Test .........................................................................52
      D.      Liquidation Analysis .....................................................................53
      E.      Valuation of the Reorganized Debtor..............................................54
      F.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and
            the Valuation ................................................................................54
      G.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown"
            Alternative....................................................................................54

XI.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN....................55

      A.      Alternative Plan(s) of Reorganization.............................................55
      B.      Liquidation under Chapter 7 or Chapter 11 ....................................55

XII.    THE SOLICITATION; VOTING PROCEDURES........................................56

      A.      Parties in Interest Entitled to Vote .................................................56
      B.      Classes Entitled to Vote to Accept or Reject the Plan ......................56
      C.      Waivers of Defects, Irregularities, Etc. ...........................................57
      D.      Withdrawal of Ballots; Revocation.................................................57
      E.      Voting Objection Deadline .............................................................58
      F.      Further Information; Additional Copies...........................................58

48615/0001-7249352v4

# TABLE OF APPENDICES

Appendix A     Plan of Reorganization Proposed by BNA Subsidiaries, LLC

Appendix B     Pro Forma Financial Projections

Appendix C     Liquidation Analysis

Appendix D     Waterfall Recovery Analysis

Appendix E     Valuation of Reorganized Debtor

48615/0001-7249352v4

# DISCLOSURE STATEMENT WITH RESPECT TO
## PLAN OF REORGANIZATION OF
## BNA SUBSIDIARIES, LLC

## I.      INTRODUCTION

The debtor and debtor-in-possession in the above-referenced Chapter 11 Case refers to BNA Subsidiaries, LLC (TIN: xx-xxx5412) (the "Debtor" or "Subsidiaries" or the "Company"), formerly having done business as Kennedy Information, Inc. ("Kennedy") and the Institute of Management and Administration, Inc. ("IOMA"):

The Debtor submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), for use in the solicitation of votes on the Plan of Reorganization of BNA Subsidiaries, LLC dated December 30, 2010 (the "Plan"). **A copy of the Plan is attached as Appendix A to this Disclosure Statement. All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in Article I of the Plan.**

This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition operating and financial history, its reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Case and the anticipated organization, operations, and financing of the Debtor upon its successful emergence from chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a Distribution under such plan are entitled to vote on the Plan. In the Debtor's case, only Claims in **Classes 3, 4, 5, 6 and 7** are impaired by and entitled to receive a Distribution under the Plan, and only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims and Interests in **Classes 1 and 2** are unimpaired by the Plan, and such Holders are conclusively presumed to have accepted the Plan. Claims or Interests in **Classes 8 and 9**, which receive no Distribution under the Plan, are deemed to have rejected the Plan and the Holders of Claims or Interests in each of such Classes are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE SECTION VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION," AND SECTION VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT,

INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR SHALL IT BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF ALLOWED CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR WITH RESPECT TO ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. **EXCEPT WITH RESPECT TO THE PRO FORMA FINANCIAL PROJECTIONS SET FORTH IN THE ATTACHED APPENDIX B (THE "PROJECTIONS") AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR DOES NOT UNDERTAKE ANY OBLIGATION TO, AND DOES NOT INTEND TO, UPDATE THE PROJECTIONS; THUS, THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS. FURTHER, THE DEBTOR DOES NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE DEBTOR, MAY DIFFER FROM ACTUAL RESULTS.**

**THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE THE DEBTOR TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS, INCLUDING THE HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 6 AND 7. THE DEBTOR URGES SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

## II.    OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Section VI of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan designates for the Debtor seven (8) Classes of Claims and one (1) Class of Interests. These Classes take into account the differing nature and priority of the various Claims and Interests under the Bankruptcy Code.

The Debtor believes that the Plan provides the best means currently available for the Debtor's emergence from chapter 11.

## A.     General Structure of the Plan

Claims are treated generally in accordance with the priorities established under the Bankruptcy Code. Claims that have priority status under the Bankruptcy Code or that are secured by valid liens on collateral are to be paid in full or reinstated as provided in the Plan.

The following is an overview of certain material terms of the Plan:

- The Debtor will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of chapter 11 for the benefit of its creditors, customers, suppliers, employees, and communities.

- Allowed Administrative Claims and Priority Tax Claims will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the Holders of such claims.

- The Bureau of National Affairs, Inc. ("BNA" or the "DIP Lender") will acquire (a) 100% of the New Equity of the Reorganized Debtor in consideration for (i) a waiver of its DIP Facility Claim and its BNA Intercompany Claim; (ii) the DIP Lender's agreement as set forth in the Commitment Letter annexed as Exhibit A to the Plan to contribute 100% of the General Unsecured Claim Distribution for deposit into the General Unsecured Claim Account for Distribution to Holders of Allowed General Unsecured Claims; and (iii) payment of 100% of the DIP Lender's professional fees and expenses in an amount not to exceed $150,000 or (b) in the event of an Alternative Transaction, (i) Cash in an amount equal to the unpaid portion of such Allowed DIP Priority Claim and a termination fee of $125,000 payable upon consummation of an Alternative Transaction or (ii) such less favorable treatment agreement upon in writing by the Debtor and the DIP Lender.

- BNA, as the holder of an Allowed Class 6 BNA Intercompany Claim, will receive 100% of the membership interest in Reorganized Subsidiaries (the "New Equity") to be issued in consideration for (i) a waiver of the full amount of the Allowed BNA Intercompany Claim and (ii) the agreement by the Holder of the Allowed BNA Intercompany Claim as set forth in the Commitment Letter annexed as Exhibit A to the Plan to contribute 100% of the General Unsecured Claim Distribution for deposit into the General Unsecured Claim Account for Distribution to Holders of Allowed General Unsecured Claims, or (b) in the event of an Alternative Transaction, treatment as an Allowed General Unsecured Claim, unless otherwise agreed upon in writing by the Holder of an Allowed Intercompany Claim.

- The Plan provides for the possible acquisition of all or substantially all of the Debtor's assets by a party other than the DIP Lender on substantially the same terms (an "Alternative Transaction"). The Debtor will be filing a sale motion to obtain approval of an Alternative Transaction and it will be necessary for the Debtor to consider whether an Alternative Transaction is higher or otherwise better than the consideration provided for by BNA under the Plan to obtain the New Equity.

- Other Priority Claims will be paid in full on or as soon as reasonably practicable after the later of (a) the Distribution Date or (b) the date on which an Allowed Other Priority Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such Other Priority Claim, unless otherwise agreed upon in writing by the Holders of such Claims.

48615/0001-7249352v4

- Other Secured Claims will be paid in full or Holders of such Claims will receive their Collateral on or as soon as reasonably practicable after the later of (a) the Distribution Date or (b) the date on which an Other Secured Claim becomes an Allowed Other Secured Claim, unless otherwise agreed upon in writing by the Holders of such Claims.

- A Holder of an Allowed Class 3 General Unsecured Claim will receive its Pro Rata share of Cash from the General Unsecured Claim Account. The General Unsecured Claim Account will be funded by the DIP Lender with Cash in the greater of (a) the aggregate amount of $100,000.00 or (b) the unused amount of the DIP Financing as of the Effective Date.

- A Holder of an Allowed Class 3 General Unsecured Claim that makes the Convenience Claim Election on its Ballot will have its Allowed General Unsecured Claim treated as an Allowed Class 4 Convenience Claim and will receive the greater of (a) five dollars ($5.00) or (b) one percent (1%) of such Holder's Allowed Class 3 General Unsecured Claim.

- A Holder of an Allowed Class 5 Trade Vendor Claim that has (a) voted in favor of the Plan and (b) executed a Trade Vendor Claim Agreement will receive Cash in the amount of 50% of its Allowed Trade Vendor Claim. Any Holder of an Allowed Class 5 Trade Vendor Claim that does not (a) vote in favor of the Plan and (b) execute a Trade Vendor Claim Agreement will have its Claim treated as a Class 3 General Unsecured Claim or may elect to be treated as a Class 4 Convenience Claim.

- On the Effective Date, each holder of an Other Intercompany Claim shall receive in full satisfaction, release and discharge of, and in exchange for such Allowed Other Intercompany Claim, (a) (i) treatment as an Allowed General Unsecured Claim or (ii) such other less favorable treatment as to which the Holder of an Allowed Other Intercompany Claim shall have agreed upon in writing or (b) in the event of an Alternative Transaction, (i) resolution of the Allowed Other Intercompany Claim through set-off and (ii) treatment as an Allowed General Unsecured Claim for any remaining amount after set-off.

- De Minimus Claims will not receive any Distributions under the Plan.

- All Equity Interests will be cancelled.

- The Debtor's Causes of Action will be transferred to or vest with the Reorganized Debtor, except those Causes of Action set forth on the Schedule of Excluded Causes of Action, attached to the Plan as Exhibit G. The Reorganized Debtor will retain and may enforce, sue on, settle, or compromise all such Causes of Action, or may decline to do any of the foregoing with respect to any such Causes of Action. The transferred Causes of Action will include any alter ego or veil piercing claims that may be brought against the DIP Lender by the Debtor or the Debtor's Estate.

## B. Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the pre-petition Claims and Interests under the Plan. Estimated Claim amounts assume a calculation date of December 20, 2010, except that General Unsecured Claims are calculated as of the Petition Date. Estimated percentage recoveries are also set forth below for certain Classes of Claims. Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.

48615/0001-7249352v4

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. The Debtor has not yet reviewed and fully analyzed all Proofs of Claim filed in the Chapter 11 Case. Estimated Claim amounts for each Class set forth below are based upon the Debtor's review of its books and records and of certain Proofs of Claim, and include estimates of a number of Claims that are contingent, disputed, and/or unliquidated.

Solely for purposes of the Plan, SSG Capital Advisors, LLC ("SSG") has estimated that the enterprise value of the Reorganized Debtor falls in a range between approximately $1.1 million to $1.2 million. This estimated range of value represents hypothetical values that reflect the estimate intrinsic value of the Reorganized Debtor derived through the application of various valuation techniques.

The foregoing valuation of the Reorganized Debtor is based on a number of assumptions and conditions, which are more fully set forth in the valuation attached as Appendix E to this Disclosure Statement.

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| Class 1: Other Priority Claims<br><br>Estimated Aggregate Allowed Amount of Class 1 Claims: $30,000<br><br>Estimated Recovery: 100% | • **Unimpaired**<br>• Class 1 consists of Claims that are entitled to priority pursuant to Bankruptcy Code section 507(a), other than a Priority Tax Claim or an Administrative Claim.<br>• On, or as soon as reasonably practicable after the later of (a) the Distribution Date or (b) the date on which an Allowed Other Priority Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (i) Cash equal to the unpaid portion of the Face Amount of such Allowed Other Priority Claim or (ii) such other less favorable treatment as to which the Debtor and such Holder shall have agreed upon in writing.<br>• Class 1 Claims are Unimpaired and are therefore not entitled to vote on the Plan. |
| Class 2: Other Secured Claims<br><br>Estimated Aggregate Allowed Amount of Class 2 Claims: $0<br><br>Estimated Recovery: 100% | • **Unimpaired**<br>• Class 2 consists of Claims that are (a) secured by a valid and perfected Lien on property in which the Debtor's Estate has an interest and which Lien is superior to the Lien of the DIP Lender or (b) subject to setoff under Bankruptcy Code section 553 and such right of setoff has been asserted by the holder of such right prior to the Confirmation Date in a properly filed motion for relief from the automatic stay, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or, |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | in the case of setoff, pursuant to Bankruptcy Code section 553. |
| | • On, or as soon as reasonably practicable after the later of, (a) the Distribution Date or (b) the date on which an Other Secured Claim becomes an Allowed Secured Claim, a Holder of an Allowed Secured Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for, such Allowed Secured Claim, (i) Cash equal to the value of its Allowed Secured Claim, (ii) the Holder's Collateral securing the Secured Claim or (iii) such other less favorable treatment as to which the Debtor and such Holder shall have agreed upon in writing. Any Holder of an Other Secured Claim will retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Debtor free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until such time as (A) the Holder of such Other Secured Claim (i) has been paid Cash equal to the value of its Allowed Secured Claim, (ii) has received the Collateral securing the Secured Claim or (iii) has been afforded such other less favorable treatment as to which the Debtor and such Holder shall have agreed upon in writing; or (B) such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable. |
| | • Class 2 Claims are Unimpaired and are therefore not entitled to vote on the Plan. |
| Class 3:  General Unsecured Claims<br><br>Estimated Aggregate Allowed Amount of Class 3 Claims: Unknown<br><br>Estimated Recovery: Unknown | • **Impaired**<br>• Holders of Class 3 General Unsecured Claims are entitled to vote to accept or reject the Plan.<br>• On the Distribution Date, each Holder of an Allowed General Unsecured Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim its Pro Rata share of the General Unsecured Claim Distribution. |
| Class 4:  Convenience Claims<br><br>Estimated Aggregate Allowed Amount of Class 4 Claims: Unknown<br><br>Estimated Recovery: Unknown | • **Impaired**<br>• Holders of Class 4 Convenience Claims are entitled to vote to accept or reject the Plan.<br>• Class 4 consists of General Unsecured Claims whose Holder has (a) voted in favor of the Plan and (b) made the Convenience Claim Election.<br>• As soon as reasonably practicable after the later |

6

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | of (a) the Effective Date, (b) the Distribution Date or (c) the date on which a Class 3 General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed Class 3 General Unsecured Claim that (a) votes in favor of the Plan and (b) makes the Convenience Claim Election on its Ballot will receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 3 General Unsecured Claim, the greater of (a) five dollars ($5.00) or (b) one percent (1%) of such Holder's Allowed 3 General Unsecured Claim. |
| Class 5: Trade Vendor Claims<br><br>Estimated Aggregate Allowed Amount of Class 5 Claims: $100,000<br><br>Estimated Recovery: 50% | • **Impaired**<br>• Class 5 consists of certain Claims in the amounts set forth on the Schedule of Trade Vendor Claims, attached to the Plan as Exhibit E, arising prior to the Petition Date relating to the receipt of goods or services by the Debtor from trade creditors or service providers, in the ordinary course of the Debtor's business.<br>• On the Distribution Date, each Holder of an Allowed Trade Vendor Claim that has (a) voted in favor of the Plan and (b) executed a Trade Vendor Claim Agreement will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Trade Vendor Claim, Cash in the amount of 50% of its Allowed Trade Vendor Claim. Any Holder of an eligible Trade Vendor Claim that does not (a) vote in favor of the Plan and (b) execute a Trade Vendor Claim Agreement will have such Claim treated as a Class 3 General Unsecured Claim or may elect Class 4 Convenience Claim treatment. |
| Class 6: BNA Intercompany Claim<br><br>Estimated Aggregate Allowed Amount of Class 6 Claim: $2,654,420.01<br><br>Estimated Recovery: Unknown | • **Impaired**<br>• Class 6 consists of (i) any Claim held by the Debtor against BNA or BNA against the Debtor, including, without limitation, the net of: (a) any account reflecting intercompany book entries by the Debtor against BNA or BNA against the Debtor and (b) any Claim not reflected in such book entries that is held by the Debtor against BNA or BNA against the Debtor.<br>• On the Effective Date, the Holder of an Allowed BNA Intercompany Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed BNA Intercompany Claim and its Allowed DIP Facility Claim, (a) 100% of the New Equity in the Reorganized Debtor to be |

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | issued in consideration for (i) a waiver of the full amount of the Allowed BNA Intercompany Claim and (ii) the agreement by the Holder of the Allowed BNA Intercompany Claim as set forth in the Commitment Letter to contribute 100% of the General Unsecured Claim Distribution for deposit into the General Unsecured Claim Account for Distribution to Holders of Allowed General Unsecured Claims in accordance with Section 5.1 of the Plan, or (b) in the event of an Alternative Transaction, (i) treatment as an Allowed General Unsecured Claim or (ii) such other less favorable treatment as to which the Holder of an Allowed BNA Intercompany Claim shall have agreed upon in writing. |
| Class 7: Other Intercompany Claims<br><br>Estimated Aggregate Allowed Amount of Class 7 Claims: $54,218.21<br><br>Estimated Recovery: Unknown | • **Impaired**<br>• Class 7 consists of the net of (i) any Claim held by the Debtor against a non-Debtor affiliate (other than BNA) or the non-Debtor affiliate (other than BNA) against the Debtor, including, without limitation: (a) any account reflecting intercompany book entries by a Debtor against a non-Debtor affiliate (other than BNA) or the non-Debtor affiliate (other than BNA) against the Debtor and (b) any Claim not reflected in such book entries that is held by a Debtor against a non-Debtor affiliate (other than BNA) or the non-Debtor affiliate (other than BNA) against the Debtor.<br>• On the Effective Date, each holder of an Other Intercompany Claim shall receive in full satisfaction, release and discharge of, and in exchange for such Allowed Other Intercompany Claim, (a) (i) treatment as an Allowed General Unsecured Claim or (ii) such other less favorable treatment as to which the Holder of an Allowed Other Intercompany Claim shall have agreed upon in writing or (b) in the event of an Alternative Transaction, (i) resolution of the Allowed Other Intercompany Claim through set-off and (ii) treatment as an Allowed General Unsecured Claim for any remaining amount after set-off. |
| Class 8: De Minimus Claims<br><br>Estimated Recovery: 0% | • **Impaired**<br>• Class 8 consists of General Unsecured Claims for which the Allowed amount of each Claim is less than or equal to $500.00<br>• On the Effective Date, the Holders of the De Minimus Claims will not be entitled to, and will not receive or retain any property or interest in property under the Plan on account |

48615/0001-7249352v4

| Description and Amount of Claims or Interests | Summary of Treatment |
|---|---|
| | of such Intercompany Claims.<br>• Class 8 is deemed to have rejected the Plan and, therefore, Holders of De Minimus Claims are not entitled to vote to accept or reject the Plan. |
| Class 9: Equity Interests<br><br>Estimated Recovery: 0% | • **Impaired**<br>• Class 9 consists of, collectively, the common stock, preferred stock, membership interest or other equity interests of and in the Debtor outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such common stock, preferred stock or other equity interest.<br>• On the Effective Date, all Equity Interests of any kind will be cancelled, as of the Effective Date, and the Holders thereof will not receive or retain any property or interest in property under the Plan on account of such Interests.<br>• Class 9 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan. |

As set forth above, estimated Claim amounts assume a calculation date of December 30, 2010, except that Unsecured Claims are calculated as of the Petition Date. The calculation date is not necessarily the Effective Date of the Plan. The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR AND THUS **STRONGLY RECOMMENDS** THAT YOU VOTE TO **ACCEPT** THE PLAN.

### III.  PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.  Notice to Holders of Claims**

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims entitled to vote on the Plan to make an informed judgment about whether to accept or reject the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER

THE PLAN. THUS ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS AND EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein or therein. No such information should be relied upon in making a determination to vote to accept or reject the Plan.

## B.     Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a Distribution under such plan are entitled to vote on the plan. Under the Plan, only Holders of Claims in Classes 3, 4, 5, 6 and 7 are entitled to vote on the Plan. Claims and Interests in other Classes are either Unimpaired and their Holders are deemed to have accepted the Plan, or they are receiving no Distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Claims in the voting Classes are entitled to vote on the Plan. Pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 3003(c)(2), any Holder of a Claim (a) that is either (i) not scheduled or (ii) scheduled in the Schedules and Statements at zero, as unknown or as disputed, contingent or unliquidated, and (b) that is not the subject of a Proof of Claim filed by _____ __, 2010 (the "Solicitation Record Date") will not be treated as a creditor with respect to such Claim for purposes of voting on or objecting to the Plan.

## C.     Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through its voting agent, Logan & Company, Inc. (the "Voting Agent" or "Logan"), will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time, and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (d) other materials as authorized by the Bankruptcy Court, as more fully set forth in the Solicitation Procedures Order.

If you are the Holder of a Claim who believes you are entitled to vote on the Plan, but you did not receive a ballot or your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the following:

> LOGAN & COMPANY, INC.
> 546 Valley Road
> Upper Montclair, NJ 07043
> Telephone: (973) 509-3190

## D.     Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return it as instructed in the envelope provided.

48615/0001-7249352v4

Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot(s) sent to you with this Disclosure Statement.

All votes to accept or reject the Plan must be cast by using the ballot enclosed with the Disclosure Statement. IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN _____ __, 2011, AT 4:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

BNA SUBSIDIARIES, LLC BALLOT PROCESSING CENTER
c/o LOGAN & COMPANY, INC.
546 Valley Road
Upper Montclair, NJ 07043
Telephone: (973) 509-3190

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, BALLOTS CAST BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS, OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

LOGAN & COMPANY, INC.
546 Valley Road
Upper Montclair, NJ 07043
Telephone: (973) 509-3190

For further information and general instruction on voting to accept or reject the Plan, see Section XII of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTOR URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT TO ACCEPT THE PLAN BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E.     Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for _____ __, 2011, at ____ Eastern Time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing. Objections to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim. Any such objection must be filed with the Bankruptcy Court on or before _____ __, 2011, at 4:00 p.m. Eastern Time. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

48615/0001-7249352v4

## IV.    GENERAL INFORMATION CONCERNING THE DEBTOR

### A.    Overview of Business Operations

Subsidiaries' parent, BNA, is the largest independent publisher of information and analysis products for professionals in business and government. It publishes -- in print and electronic formats – more than 350 daily, weekly, monthly, and up-to-the-minute news services covering the full range of legal, legislative, regulatory, and economic developments that impact the business environment around the nation and the world.

### B.    The Debtor's Corporate Structure

BNA is wholly employee-owned company and has been since 1947. Subsidiaries is a wholly-owned subsidiary of BNA, a non-debtor, which in turn owns eight (8) other non-debtor affiliates of Subsidiaries. Subsidiaries has no subsidiaries of its own.

Based in Peterborough, New Hampshire, the Debtor was formed on January 1, 2009 through the merger of Kennedy and IOMA. Kennedy and IOMA were two independent entities acquired by BNA in 2000 and 1997, respectively.

### C.    Operational Matters

1.    Overview

As of the Petition Date, the Debtor employed approximately 111 employees, 104 of whom are classified as full-time employees and 7 of whom are classified as part-time employees. Approximately 90% of all employees are salaried personnel and the remaining 10% are hourly wage earners. Due to a reduction in workforce effective as of December 31, 2010, the Debtor now has approximately 84 employees.

(a)    IOMA

IOMA was established in 1983 with a single newsletter – Law Office Management and Administration Report. When BNA acquired IOMA, in 1997, it published approximately 25 newsletters providing news and analysis for specific business to business segments. At that time, newsletter subscriptions and list rentals produced virtually all of its revenues. The market for monthly printed newsletters began to decline between 2000 and 2005 and, by 2005, IOMA had abandoned several newsletter publishing markets and reduced its workforce substantially. A variety of forces caused this decline, but two were particularly damaging: the first, an industry-wide direct mail marketing trend-rising cost of mailing and declining returns on mailed solicitations; and the second, the constantly increasing amount free information available on the internet. IOMA began publishing research reports, producing more live conferences, and producing topical audioconferences. Newsletter subscriptions, by the end of 2007, accounted for only 64% of revenues. Unfortunately, however, the overall number of subscribers for its remaining publications continued to decline; and these new revenue sources, while relatively successful, could not make up for the lost revenue, and they had relatively higher marketing costs. In 2007, IOMA developed a plan to move out of Manhattan, where it had been since it was founded. IOMA moved approximately 70 employees to Newark, NJ in March of 2008 and reduced its office space from approximately 24,000 feet to approximately 12,000 square feet, also halving the per-square-foot rental cost compared to the cost of renewing in the Manhattan location.

Until recently, the IOMA division was based in New Jersey. As of the date of this Disclosure Statement, the IOMA division has 25 employees, most of whom work in one of the Debtor's corporate offices in Maryland or New York, although some work out of their homes.

48615/0001-7249352v4

(b)     Kennedy

Kennedy was founded in 1970, based on a single newsletter covering the executive recruiting profession.  By 2000, when BNA acquired it, Kennedy served professionals in executive recruiting, management consulting, and investor relations, publishing 8 newsletters, 2 magazines, and in-depth research reports.  It also produced several live conferences for executive recruiters, corporate recruiters, and management consultants.

The downturns of 2001-2003 and the current recessionary climate adversely affected Kennedy's recruiting and investor relations clients.  In turn, Kennedy's business to those customers declined sharply.  Kennedy shut down several newsletters, sold its corporate recruiting and investor relations assets and closed down its services to executive recruiters.  While also impacted by the downturns, Kennedy's products and services to the management consulting profession remain viable.  Kennedy has become, and remains, the leading research firm for that industry, producing more than 20 research reports, the leading industry magazine, Webinars and live events each year.

The Kennedy division is based in New Hampshire and has 59 employees as of the date of this Disclosure Statement.

2.     Competitors

(a)     Consulting Business

In the larger IT services market, the Company competes with a number of other strong firms for research dollars.  While the Company chose to focus only on consulting, these other firms tend to look more closely at downstream services activities, including systems integration, applications development, and outsourcing.  The IT space has attracted numerous market research and advisory firms, including Gartner, IDC, Yankee, Forrester, TBR and Datamonitor/Ovum (UK).  The Company continues to differentiate itself from these mostly larger competitors by focusing on the markets (service line, vertical, geographic) its clients operate in, rather than on the companies themselves or their products.

Other competitive threats come primarily from the bottom up.  A continued threat is TopConsultant.com, a UK-based job recruiter that gives away content on the industry to attract job seekers to its Web site.  The Company also faces competition from free and ad-sponsored Weblogs, newsletters and research available on the Web through search engines.

(b)     Consulting Magazine Business

From an advertising standpoint, the Company competes with a range of other print and online publications for ad dollars.  The magazine's primary advertisers and sponsors are technology vendors trying to reach consultants, and they have choices as to where they place their marketing spend.  Ziff and other technology publishers pose formidable alternatives given their broader reach into the IT services audience. The Company, however, has the most tightly focused readership in terms of management consultants.

(c)     Medical Labs Business.

G-2 has been the leading publisher and brand in the market for over 25-years.  Existing competitors, including the Dark Report, Eli Research, CLMA (for Clinical LabManagers), and CAP (College of American Pathologists), continue to expand their products and services along with G-2.  Another potential competitor, HCPro, currently approaches the lab market peripherally from other health care and hospital areas like compliance, coding and billing, but as of yet has not directly entered the lab market beyond this presence. Finally, a competing newsletter, Laboratory Economics, was created by Jon-David Clipp, (a former G-2 editor), who has established one newsletter and publishes two research reports.

(d)    Fertilizer/Agri-Chemical Business

The Company's weekly newsletters, Green Markets and Dealer Report, are widely recognized and valued as an independent editorial source of record in this fast moving, commodity-based sector. Global competitors, including British Sulphur/CRU and Fertecon, along with multiple national and state agriculture associations, enjoy a critical platform advantage that allows them to more efficiently leverage their editorial assets.

3.    Trademarks

The Debtor actively enforces and defends its rights related to its intellectual property portfolio, which is of material importance to its operations.  The Debtor has approximately 18 copyrights and 6 trademarks that are registered or pending as applications in the United States Patent and Trademark Office.

4.    Customer Programs

The Debtor offers a variety of benefits to its customers in order to maintain and ensure customer loyalty and satisfaction.  For example, the Debtor offers pre-paid advertising programs to attract new advertising customers, retain existing ones and increase advertising purchasing volume. The Debtor also bills subscribers on payments terms ranging from net 30 to net 60 days.  Additionally, the Debtor allows its customers to return certain products if the customer is not satisfied with its purchase. The Debtor believes that these programs and benefits are vital to its ongoing relationship with its customers.

5.    Insurance

The Debtor maintains general liability insurance coverage and various other insurance policies through its parent, BNA.

**D.    Debtor's Capital Structure**

1.    Postpetition Superpriority Secured Obligations

On October 19, 2010, the Debtor obtained authority under the Final Order Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), and 364(c)(3) [Docket No. 74] (the "Final DIP Order") to obtain postpetition financing (the "DIP Financing") to provide funds for the payment of permitted pre-petition claims, fund the orderly continuation of the operation of the Debtor's business, maintain business relationships with vendors and suppliers and satisfy working capital needs. The obligations under the DIP Financing are secured by liens on substantially all of the Debtor's assets, which liens have priority in accordance with the terms of the Final DIP Order.  The DIP Financing consists of loans made to the Debtor by the DIP Lender under a debtor in possession financing facility (the "DIP Facility") in an amount not to exceed $1.5 million in the aggregate.

The Debtor estimates that the amount of borrowings under the DIP Facility will be approximately $1.224 million as of the Effective Date.

2.    Prepetition Debt Structure

As of the Petition Date, the Debtor's capital structure consisted of unsecured debt owed to BNA and other parties as well as membership interests held solely by BNA.  Specifically, as of September 11, 2010, BNA held an intercompany payable in the amount of $2,074,146.00.  In addition, other intercompany obligations as of the Petition Date include (i) $53,418.21 owed to non-Debtor affiliate, Mcardle Printing Company and (ii) $800.00 owed to non-Debtor affiliate, STF Services Corporation.

48615/0001-7249352v4

The Debtor also estimates that it owes approximately $555,000 in prepetition claims to unsecured non-priority creditors (net of trade creditors). To date, the approximate amount of filed liquidated unsecured non-priority claims totals $1.35 million. Subsidiaries had no secured debt as of the Petition Date.

3.     Litigation Claims

The Debtor is a defendant in a prepetition lawsuit that alleges certain employment law violations by the Debtor. On March 18, 2010, Hilary Sloin filed a complaint against the Debtor seeking compensation in the amount of approximately one hundred and thirty thousand dollars ($130,000.00), plus treble damages and attorneys' fees, for the value of certain employee benefits which she alleges were denied to her based on her classification as an independent contractor. The Debtor denies the allegations in the Sloin complaint.

The Debtor is also a defendant in a prepetition class action lawsuit that seeks a recovery in an amount over fifteen million dollars ($15M) for claims allegedly arising from the transmission of marketing facsimiles by the Debtor in violation of the Telephone Consumer Protection Act (the "Holster Action"). The Holster Action was filed on October 30, 2009 in the United States District Court for the District of New Hampshire. The complaint alleges that between August 16, 2006 and June 27, 2007, the Debtor (then IOMA), transmitted at least twelve (12) facsimiles to the plaintiff for the purpose of marketing its goods and services. The complaint further alleges that the plaintiff did not give the Debtor express invitation or permission to transmit the facsimiles. In addition, the complaint alleges that the Debtor transmitted more than ten thousand (10,000) facsimiles to over one hundred (100) recipients over the course of four (4) years without prior express invitation or permission. Based on these allegations, the Holster Complaint sought to proceed as a class action on behalf of members of the class, and sought statutory damages in the amount of five hundred dollars ($500.00) plus additional statutory damages in the amount of one thousand dollars ($1,000.00) per each alleged violation, which would result in a potential recovery against the Debtor of over fifteen million dollars ($15M). As of the Petition Date, no class had been certified in the Holster Action. The Debtor disputes the allegations in the Holster complaint.

As of the Debtor's chapter 11 filing, with certain exceptions or unless otherwise ordered by the Court, the automatic stay prevents parties from pursuing any pre-petition claims and lawsuits. All liabilities alleged against the Debtor in such claims and lawsuits will be treated under the Plan as General Unsecured Claims or De Minimus Claims, to the extent such claims are Allowed. Claims and lawsuits based upon liabilities arising after the Petition Date are not subject to the automatic stay, although they will be subject to the Administrative Claims Bar Date established by the Plan.

E.     **Events Leading to the Filing of the Chapter 11 Case**

The economic downturn that began in the second half of 2008 had a disproportionately negative effect on the publishing industry and on several of the IOMA and Kennedy brand product lines. Markets for information and meetings for corporate recruiters, and publications of all types aimed at functional departments in corporations were particularly depressed. On January 1, 2009, BNA combined the Kennedy and IOMA subsidiaries into a newly formed BNA Subsidiaries, LLC. The aim was to reduce operating costs and rationalize both management and shared services across the two organizations. As publishing demand continued to deteriorate, BNA and the Debtor began conducting a comprehensive review of their respective business operations and strategic alternatives and, near the end of 2009, adopted and began to implement an out-of-court strategic restructuring plan.

As part of the plan, the Debtor discontinued, transferred or sold several products and product lines in an effort to create a more focused and profitable company that serves vertical industry markets with high quality information services. Specifically, at the end of 2009, the Debtor transferred the assets of the following three business units to BNA: the former IOMA Human Resources and Payroll business unit, the Pike & Fisher Telecommunications unit, and the Pike & Fisher Legal and Regulatory unit. The IOMA Human

Resources publishing business had been declining in revenue and profit due to the emergence of the Society of Human Resource Management (SHRM) as a more formidable publishing competitor. IOMA lacked the sales and marketing resources to compete effectively. Additionally, several of the Payroll and the Pike and Fisher publications were loose leaf binder publications and IOMA was moving to a lower priced publishing platform that would no longer support those publications. These product lines fit well with BNA's publishing platform and its field sales force. Consequently, IOMA transferred these products to BNA in exchange for assumption by BNA of fulfillment liabilities and a transfer of balance sheet goodwill. The Debtor continues to provide transition services to BNA and intends to continue to do so until the product lines and operations are integrated into BNA's existing editorial, production, and distribution functions. BNA reimburses the Debtor for the transition services on a cost plus basis. Additionally, during 2009, the Debtor sold the former Kennedy Investor Relations and Corporate Recruiting business assets, and the former IOMA Corporate Finance business assets. It also discontinued its Executive Recruiting business unit.

Furthermore, the Debtor made numerous facility and employment changes in New Hampshire and New Jersey with the goal of consolidating most of the Debtor's operating functions in New Hampshire during 2010. As of the Petition Date, only ten (10) employees worked full-time at the Newark office and it has since been closed.

Notwithstanding the implementation of the strategic restructuring plan, the Debtor continued to experience financial losses and continued to incur expenses that are beyond its ability to self fund that negatively affected its financial performance. While such operating losses had historically been funded by BNA, shortly before the filing the Debtor was informed by BNA that BNA would no longer provide unsecured funding and/or equity infusions in light of, among other things, market weakness for the Debtor's products and product lines.

Furthermore, the Debtor's funding needs were expected to increase as a result of the substantial cost it was likely to incur in defending itself in the Holster Litigation commenced in November, 2009. As discussed above, the class action litigation seeks recovery in an amount over $15M for claims allegedly arising from the transmission of marketing facsimiles by Subsidiaries in violation of the Telephone Consumer Protection Act.

Although Subsidiaries intended to vigorously defend against the class action lawsuit, the costs associated with the Debtor's defense against the class action litigation were expected to be substantial and with no assurance of success. In the event that the Debtor had ultimately been unsuccessful in defending the class action litigation, a judgment for the plaintiffs in the class action would have had a material adverse effect on the ability of the Debtor to continue as a going concern.

In addition, the Debtor was in the process of defending against litigation filed by one of its former independent contractors alleging damages for the wrongful denial of benefits and alleged improper payment of Subsidiaries' share of taxes for FICA and Medicare.

Thus, faced with the possibility that it would no longer be able to continue as a going concern for the many reasons identified above, the Debtor began to consider various additional restructuring alternatives, including discontinuing additional operations, further sales or transfers of products or product lines and/or the commencement of a chapter 11 reorganization case.

## V.    CHAPTER 11 CASE

### A.    Continuation of Business; Stay of Litigation

As described above, on September 23, 2010, the Debtor commenced the Chapter 11 Case by filing a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Since the Petition Date, the Debtor has continued to operate as a debtor in

possession, subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its businesses in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtor, and the continuation of litigation against the Debtor. The relief provides the Debtor with the "breathing room" necessary to assess and reorganize its businesses and prevents Creditors from obtaining an unfair recovery advantage while the Chapter 11 Case is ongoing.

The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan.

## B.    First Day Orders

The first day hearing (the "First Day Hearing") was held in the Chapter 11 Case before the Bankruptcy Court on September 29, 2010. At the First Day Hearing, the Bankruptcy Court heard certain requests for immediate relief filed by the Debtor to facilitate the transition between the Debtor's pre-petition and post-petition business operations. Many of the first day orders obtained in the Bankruptcy Case by the Debtor were typical for similarly-sized chapter 11 cases.

Following the First Day Hearing, the Bankruptcy Court entered first day orders that authorized, among other things:

- the appointment of Logan as claims, noticing and balloting agent (the "Claims Agent") (Docket No. 22);

- continued use of existing cash management system and bank accounts (Docket No. 23);

- payment of certain pre-petition employee wages and certain employee benefits, and continuation of employee programs on a post-petition basis (Docket Nos. 24 and 71);

- deeming utilities adequately assured of payment, prohibiting utilities from altering, refusing, or discontinuing services, and establishing procedures for resolving requests for adequate assurance (Docket No. 25);

- the honoring of certain pre-petition customer obligations and continuation of customer programs and practices (Docket No. 26);

- payment of certain pre-petition sales and use taxes (Docket No. 27);

- payment of certain pre-petition shipping and delivery charges (Docket No. 28);

- payment of critical vendors in exchange for trade terms (Docket No. 29);

- obtaining secured, superpriority, post-petition financing on an interim basis (Docket No. 30) (the "Interim DIP Order");

## C.      Retention of Professionals

During this Chapter 11 Case, the Bankruptcy Court has authorized the retention of two professionals by the Debtor: (i) Cole, Schotz, Meisel, Forman & Leonard, P.A. as bankruptcy counsel (Docket No. 64); and (ii) SSG Capital Advisors, LLC as financial advisors (Docket No. 66).

## D.      Official Committee

No Official Committee of Unsecured Creditors has been appointed by the Office of the United States Trustee (the "U.S. Trustee").

## E.      Post-Petition and Post-Confirmation Funding

### 1.      DIP Financing

As part of the restructuring process under Chapter 11, on the Petition Date the Debtor filed a Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(2) and 364(c)(3) and Federal Rules of Bankruptcy Procedure 4001 and (II) Scheduling Final Hearing pursuant to Bankruptcy Rule 4001(c) (Docket No. 12) (the "DIP Motion"). On September 29, 2010, the Court entered the Interim DIP Order that, among other things, authorized and approved financing up to $400,000 on an interim basis, and scheduled the final hearing on the DIP Motion for October 20, 2010, at 11:00 a.m. On October 20, 2010, the Court entered the Final DIP Order approving the DIP Financing in an amount of up to $1.5 million on a final basis. As of the date of this Disclosure Statement, the Debtor has borrowed approximately $700,000 under the DIP Agreement.

## F.      Other Material Matters Addressed During the Chapter 11 Case

In addition to the first day relief sought in the Chapter 11 Case, the Debtor has sought authority with respect to a multitude of matters designed to assist in the administration of the Chapter 11 Case, maximize the value of the Debtor's Estate, and provide the foundation for the Debtor's emergence from Chapter 11. Set forth below is a brief summary of certain of the principal motions the Debtor has filed during the pendency of the Chapter 11 Case.

### 1.      Rejection of Non-Residential Real Property Lease

The Debtor is a party to four (4) leases of non-residential real property located in New Hampshire, New York, New Jersey and Maryland.

On November 15, 2010, the Debtor filed a motion to reject its New Jersey lease (which houses ten employees in its IOMA division), effective as of December 31, 2010 (Docket No. 98) (the "Lease Rejection Motion"). On December 2, 2010 (Docket No. 110), the Bankruptcy Court granted the relief requested in the Lease Rejection Motion.

The Debtor is currently considering its options with respect to its other leases.

### 2.      Rejection of Certain Executory Contracts

On December 10, 2019, the Debtor filed a motion to reject five executory contracts (Docket No. 123) (the "Contract Rejection Motion"). On December 28, 2010 (Docket No. 141), the Bankruptcy Court granted the relief requested in the Contract Rejection Motion approving the rejection of the executory contracts effective as of December 28, 2010.

48615/0001-7249352v4

3.   Approval of Payments to Non-Insider Employees

On December 13, 2010, the Debtor filed a motion seeking authorization to make certain severance and paid time off payments up to a total $265,000 to non-insider employees who will be terminated on or before December 31, 2010 (Docket No. 125) (the "Employee Motion"). On December 28, 2010 (Docket No. 142), the Bankruptcy Court granted the relief requested in the Employee Motion.

4.   Claims Process

(a)   Schedules and Statements of Financial Affairs

On October 22, 2010, the Debtor filed its Schedules and Statements (Docket Nos. 75-76) that, among other things, set forth the Claims of known creditors against the Debtor as of the Petition Date, based upon the Debtor's books and records.

(b)   Claims Bar Date and Proofs of Claim

By order entered November 2, 2010 (Docket No. 85) (the "Bar Date Order"), the Bankruptcy Court established December 13, 2010 at 5:00 p.m. (Eastern Time) as the general bar date for filing proofs of claim against the Debtor (the "General Bar Date"). Governmental units are required to file proofs of claim by March 23, 2011 at 5:00 p.m. (Eastern Time) (the "Governmental Bar Date"). The Bar Date Order provides that any Creditor that is required to file but fails to file a Proof of Claim for its Claim on or before the General Bar Date or the Governmental Bar Date, as applicable, will not be treated as a Creditor with respect to such Claim for purposes of voting and distribution in this chapter 11 case.

5.   Adversary Proceeding

On November 8, 2010, the plaintiff in the Holster Action commenced an adversary proceeding in the Bankruptcy Court alleging his litigation claim is non-dischargeable pursuant to Bankruptcy Code section 523(a)(6). The Debtors is in the process of defending against the adversary proceeding and believes that the adversary proceeding is without merit. Specifically, the Debtor filed an answer asserting affirmative defenses and filed a motion for judgment on the pleadings. As of the date of this Disclosure Statement, the plaintiff has not filed a response to the motion for judgment on the pleadings.

## VI.   SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS

48615/0001-7249352v4

AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.  Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 Case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtor's Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its business plan, make the Distributions contemplated under the Plan, and pay its continuing obligations in the ordinary course of its businesses. Under the Plan, Claims against and Interests in the Debtor are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will receive Distributions equal to the full amount of such Claims, (ii) the Claims of certain other Classes will receive Distributions constituting a partial recovery on such Claims, and (iii) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date, the Distribution Date and at certain times thereafter, the Reorganized Debtor will distribute Cash, New Equity, and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtor created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

## B.  Reorganized Capital Structure Created by Plan

Pursuant to the Plan, the New Corporate Governance Documents will provide for the authorization of and issuance of 100% of the New Equity in the Reorganized Debtor to the DIP Lender.

## C.  Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than DIP Facility Claims, Administrative Claims, Professional Fee Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1), do not need to be classified). The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

48615/0001-7249352v4

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized below. The Debtor believes that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtor's assets. In view of the deemed rejection by Classes 7 and 8, however, as set forth below, the Debtor will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code permits confirmation of a Chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests. See Section X.G below. Although the Debtor believes that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1.      Treatment of Unclassified Claims under the Plan

     (a)      DIP Facility Claim

Pursuant to the Plan, a DIP Facility Claim is a Claim arising under the DIP Agreement.

The DIP Facility Claim will be Allowed in an amount equal to the outstanding amount of the DIP Financing as of the Effective Date. On the Effective Date, the Holder of an Allowed DIP Facility Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed DIP Facility Claim and its Allowed BNA Intercompany Claim, (a) 100% of the membership interest in the Reorganized Debtor (the "New Equity") to be issued in consideration for (i) a complete waiver of the full amount of the Allowed DIP Facility Claim; (ii) the agreement by the Holder of the Allowed DIP Facility Claim as set forth in the Commitment Letter annexed as Exhibit A to the Plan to contribute 100% of the General Unsecured Claim Distribution for deposit into the General Unsecured Claim Account for Distribution to Holders of Allowed General Unsecured Claims in accordance with Section 5.1 of the Plan and (iii) payment of 100% of the DIP Lender's professional fees and expenses in an amount not to exceed $150,000, or (b) in the event of an Alternative Transaction, (i) Cash in an amount equal to the unpaid portion of such Allowed DIP Facility Claim and a termination fee of $125,000, payable upon consummation of an Alternative Transaction or (ii) such other less favorable treatment as to which the Debtor and the Holder of an Allowed DIP Facility Claim shall have agreed upon in writing.

48615/0001-7249352v4

The Debtor has estimated that the DIP Facility Claim, as of the Effective Date, will consist of approximately $1.224 million on account of borrowings under the DIP Facility.

(b)        Administrative Claims

An Administrative Claim is defined in the Plan as a Claim arising under Bankruptcy Code section 507(a)(2) for costs and expenses of administration of the Chapter 11 Case under Bankruptcy Code sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, to the extent not previously paid, including, but not limited to, (a) any actual and necessary costs and expenses incurred after the Petition Date, of preserving the Estate and operating the business of the Debtor (such as wages, salaries and commissions for services rendered after the commencement of the Chapter 11 Case and payments for inventory, leased equipment and premises) and (b) all other claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, but excluding Priority Tax Claims and Professional Fee Claims.

Under the Plan, except as otherwise provided by, and subject to the requirements of the Plan, on, or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other treatment as to which the Debtor or the Reorganized Debtor, as the case may be, and such Holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Plan provides that all requests for payment of an Administrative Claim (other than as set forth in Section 3.1(b), 11.2, 11.3, 11.4, 11.5, or 11.1 of the Plan) must be made by application filed with the Bankruptcy Court and served on counsel for the Reorganized Debtor no later than thirty (30) days after the Effective Date. In the event that the Reorganized Debtor objects to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no application seeking payment of an Administrative Claim need be filed with respect to an undisputed post-petition obligation which was paid or is payable by the Debtor in the ordinary course of business. In addition, no application seeking payment of an Administrative Claim need be filed with respect to Cure owing under an executory contract or unexpired lease if the amount of Cure is fixed or proposed to be fixed by order of the Bankruptcy Court pursuant to a motion to assume and fix the amount of Cure filed by the Debtor and a timely objection asserting an increased amount of Cure filed by the non-Debtor party to the subject contract or lease.

(c)        Professional Fee Claims

A Professional Fee Claim is defined in the Plan as a Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and on or before the Effective Date.

Under the Plan, all Professional Fee Claims will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Professional Fee Claim became an Allowed Claim or (ii) upon such other terms as may be mutually agreed upon by such holder and the Reorganized Debtor.

The Plan further provides that all final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application filed with the Bankruptcy Court and served on the Reorganized Debtor, its counsel, and other necessary parties-in-interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be filed and served on the Reorganized Debtor, its

48615/0001-7249352v4

counsel, and the requesting Professional or other entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served. The Reorganized Debtor may, without application to or approval by the Bankruptcy Court, retain professionals and pay reasonable professional fees and expenses in connection with services rendered to it after the Effective Date.

(d)     Priority Tax Claims

The Plan defines Priority Tax Claims as Claims of a governmental unit of the kind specified in Bankruptcy Code section 502(i) or 507(a)(8).

The Plan provides that except to the extent that an Allowed Priority Tax Claim has been paid prior to the Distribution Date, each Holder of an Allowed Priority Tax Claim will be entitled to receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as will have been determined by the Debtor or Reorganized Debtor in their sole discretion, (i) on the Distribution Date, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) deferred Cash payments over a period not exceeding five (5) years after the date of assessment of such Allowed Priority Tax Claim in an aggregate principal amount equal to the Face Amount of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the Case Interest Rate, or (iii) such other less favorable treatment as to which the Debtor and such Holder shall have agreed upon in writing.

The Debtor has estimated that the aggregate amount of Priority Tax Claims payable under the Plan will be approximately $50,000.

2.     Treatment of Classified Claims and Interests under the Plan

(a)     Class 1: Other Priority Claims

The Plan defines Other Priority Claims as Claims entitled to priority pursuant to Bankruptcy Code section 507(a), other than a DIP Facility Claim, Priority Tax Claim, Professional Fee Claim, or an Administrative Claim.

The Plan provides that on, or as soon as reasonably practicable after the later of (a) the Distribution Date or (b) the date on which an Allowed Other Priority Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such Other Priority Claim, each Holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (i) Cash equal to the unpaid portion of the Face Amount of such Allowed Other Priority Claim or (ii) such other less favorable treatment as to which the Debtor and Holder shall have agreed upon in writing.

Other Priority Claims are Unimpaired and are therefore not entitled to vote on the Plan.

(b)     Class 2: Other Secured Claims

The Plan defines Other Secured Claims as Claims (other than a DIP Facility Claim) that are (a) secured by a valid and perfected Lien on property in which a Debtor's Estate has an interest and which Lien is superior to the Lien of the DIP Lender or (b) subject to setoff under Bankruptcy Code section 553 and such right of setoff has been asserted by the Holder of such right prior to the Confirmation Date in a properly filed motion for relief from the automatic stay, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or, in the case of setoff, pursuant to Bankruptcy Code section 553.

48615/0001-7249352v4

The Plan provides that on, or as soon as reasonably practicable after the later of, (a) the Distribution Date or (b) the date on which an Other Secured Claim becomes an Allowed Secured Claim, a Holder of an Allowed Secured Claim will receive, in full satisfaction, settlement, release and discharge of and in exchange for, such Allowed Secured Claim, (i) Cash equal to the value of its Allowed Secured Claim, (ii) the Holder's Collateral securing the Secured Claim or (iii) such other less favorable treatment as to which the Debtor and such Holder shall have agreed upon in writing. Any Holder of an Other Secured Claim will retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold by the Debtor free and clear of such Lien) to the same extent and with the same priority as such Lien held as of the Petition Date until such time as (A) the Holder of such Other Secured Claim (i) has been paid Cash equal to the value of its Allowed Secured Claim, (ii) has received the Collateral securing the Secured Claim or (iii) has been afforded such other less favorable treatment as to which the Debtor and such Holder shall have agreed upon in writing; or (B) such purported Lien has been determined by an order of the Bankruptcy Court to be invalid or otherwise avoidable.

Other Secured Claims are Unimpaired and are therefore not entitled to vote on the Plan.

(c)     Class 3: General Unsecured Claims

The Plan defines General Unsecured Claims as Unsecured Claims that are not Priority Tax Claims, Other Priority Claims, Convenience Claims, Trade Vendor Claims, De Minimus Claims, the BNA Intercompany Claim or Other Intercompany Claims.

The Plan provides that on the Distribution Date, each Holder of an Allowed General Unsecured Claim that has not made the Convenience Class Election will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Claim its Pro Rata share of the General Unsecured Claim Distribution. The General Unsecured Claim Account will be funded by the DIP Lender with Cash in the greater of (a) $100,000.00 or (b) the then undrawn amount of the $1.5 million DIP Financing that exists as of the Effective Date. The Debtor estimates that approximately $146,000 will be funded by the DIP Lender into the General Unsecured Claim Account.

General Unsecured Claims are Impaired and entitled to vote to accept or reject the Plan.

(d)     Class 4: Convenience Claims

The Plan defines Convenience Claims as General Unsecured Claims whose Holders have (a) voted in favor of the Plan and (b) made the Convenience Claim Election.

The Plan provides that as soon as reasonably practicable after the later of (a) the Effective Date, (b) the Distribution Date or (c) the date on which a Class 3 General Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed Class 3 General Unsecured Claim that (a) votes in favor of the Plan and (b) makes the Convenience Claim Election on its Ballot will receive in full satisfaction, release and discharge of and in exchange for such Allowed Class 3 General Unsecured Claim, the greater of (a) five dollars ($5.00) or (b) one percent (1%) of such Holder's Allowed 3 General Unsecured Claim. Only Holders of Class 3 General Unsecured Claims who vote in favor of this Plan may make the Convenience Claim Election.

Convenience Claims are Impaired and entitled to vote to accept or reject the Plan.

(e)     Class 5: Trade Vendor Claims

The Plan defines Trade Vendor Claims as certain Claims in the amounts set forth on the Schedule of Trade Vendor Claims, attached to the Plan as Exhibit E, arising prior to the Petition Date relating to the receipt of goods or services by the Debtor from trade creditors or service providers, in the ordinary

course of the Debtor's business. For the avoidance of doubt, Trade Vendor Claims will not include any General Unsecured Claims arising from or related to the rejection of any executory contract and/or unexpired lease. Only the Claims set forth on the Schedule of Trade Vendor Claims, attached to the Plan as Exhibit E, will be eligible for treatment as a Class 5 Trade Vendor Claim. To receive such treatment, the Trade Vendor must (a) vote in favor of the Plan and (b) execute a Trade Vendor Claim Agreement prior to the Voting Deadline.

The Plan provides that on the Distribution Date, each Holder of an Allowed Trade Vendor Claim that has (a) voted in favor of the Plan and (b) executed a Trade Vendor Claim Agreement will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Trade Vendor Claim, Cash in the amount of 50% of its Allowed Trade Vendor Claim. Any Holder of an eligible Trade Vendor Claim that does not (a) vote in favor of the Plan and (b) execute a Trade Vendor Claim Agreement will have such Claim treated as a General Unsecured Claim or may elect Convenience Claim treatment.

Trade Vendor Claims are Impaired and entitled to vote to accept or reject the Plan. The Debtor estimates that the Allowed Trade Vendor Claims will be in the approximate aggregate amount of $100,000.

(f)        Class 6: BNA Intercompany Claim

The Plan defines a BNA Intercompany Claim as any Claim held by BNA against the Debtor, including, without limitation: (a) any account reflecting intercompany book entries by BNA against the Debtor, and (b) any Claim not reflected in such book entries that is held by the non-Debtor affiliate against the Debtor.

The Plan provides that on the Effective Date, the an Allowed BNA Intercompany Claim will receive in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed BNA Intercompany Claim and its Allowed DIP Facility Claim, (a) 100% of the New Equity in the Reorganized Debtor to be issued in consideration for (i) a waiver of the full amount of the Allowed BNA Intercompany Claim and (ii) the agreement by the Holder of the Allowed BNA Intercompany Claim to contribute 100% of the General Unsecured Claim Distribution for deposit into the General Unsecured Claim Account for Distribution to Allowed General Unsecured Claims in accordance with Section 5.1 of the Plan, or (b) in the event of an Alternative Transaction, (i) treatment as an Allowed General Unsecured Claim or (ii) such other less favorable treatment as to which the Holder of an Allowed BNA Intercompany Claim shall have agreed upon in writing.

The BNA Intercompany Claim is Impaired and entitled to vote to accept or reject the Plan. The Debtor estimates that the Allowed BNA Intercompany Claim will be in the approximate aggregate amount of $2,654,420.01.

(g)        Class 7: Other Intercompany Claims

The Plan defines a Other Intercompany Claims as any Claim held by a non-Debtor affiliate (other than BNA) against the Debtor, including, without limitation: (a) any account reflecting intercompany book entries by the non-Debtor affiliate (other than BNA) against the Debtor, and (b) any Claim not reflected in such book entries that is held by the non-Debtor affiliate (other than BNA) against the Debtor.

On the Effective Date, each holder of an Other Intercompany Claim shall receive in full satisfaction, release and discharge of, and in exchange for such Allowed Other Intercompany Claim, (a) (i) treatment as an Allowed General Unsecured Claim or (ii) such other less favorable treatment as to which the Holder of an Allowed Other Intercompany Claim shall have agreed upon in writing or (b) in the event of an Alternative Transaction, (i) resolution of the Allowed Other Intercompany Claim through set-off and (ii) treatment as an Allowed General Unsecured Claim for any remaining amount after set-off.

Other Intercompany Claims are Impaired and entitled to vote to accept or reject the Plan.

(h)     Class 8: De Minimus Claims

The Plan defines De Minimus Claims as General Unsecured Claims for which the Allowed amount of such Claim is less than or equal to $50.00.

The Plan provides that the Holders of the De Minimus Claims will not be entitled to, and will not receive or retain any property or interest under the Plan on account of such De Minimus Claims.

De Minimus Claims are Impaired. Class 8 is deemed to have rejected the Plan and, therefore, Holders of De Minimus Claims are not entitled to vote to accept or reject the Plan.

(i)     Class 9: Equity Interests

The Plan defines Equity Interests as collectively, the common stock, preferred stock, membership interests or other equity interest of Subsidiaries outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such common stock, preferred stock, membership interests or other equity interests.

The Plan provides that the Holders of the Equity Interests will not be entitled to, and will not receive or retain any property or interest in property under the Plan on account of such Equity Interests.

Equity Interests are Impaired. Class 9 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

3.     Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's or the Reorganized Debtor's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## D.     Preservation of Causes of Action; Resulting Claim Treatment

The Plan provides that, except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, the Debtor's Causes of Action will be transferred to or vest with the Reorganized Debtor, except those Causes of Action set forth on the Schedule of Excluded Causes of Action, attached to the Plan as Exhibit G. The Reorganized Debtor will retain and may enforce, sue on, settle, or compromise all such Causes of Action, or may decline to do any of the foregoing with respect to any such Causes of Action. The Reorganized Debtor or its successor(s) may pursue such Causes of Action as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who holds such rights in accordance with applicable law and consistent with the terms of the Plan.

If, as a result of the pursuit of any Causes of Action, a Claim would arise from a recovery pursuant to section 550 of the Bankruptcy Code after Distributions under the Plan have commenced, making it impracticable to treat the Claim in accordance with the applicable provisions of Article III of the Plan, the Reorganized Debtor will be permitted to reduce the recovery by an amount that reflects the value of the treatment that would have been accorded to the Claim under the Plan, thereby effectively treating the Claim through the reduction.

48615/0001-7249352v4

**E.  Allowed Claims, Distribution Rights and Objections to Claims**

    1.  Allowance Requirement

Only Holders of Allowed Claims are entitled to receive Distributions under the Plan. An Allowed Claim is a Claim or any portion thereof (a) that has been allowed by a Final Order of the Bankruptcy Court (or such court as the Debtor and the Holders of any such Claim agree may adjudicate such Claim and any objections thereto), (b) that either (x) has been Scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero on the Schedules, or (y) is the subject of a timely filed proof of claim as to which either (i) no objection to its allowance has been filed (either by way of objection or amendment to the Schedules) within the periods of limitation fixed by the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled, waived through payment, withdrawn, or has been denied by a Final Order, or (c) that is expressly allowed in a liquidated amount in the Plan; provided, however, that with respect to an Administrative Claim, "Allowed Claim" means an Administrative Claim as to which a timely written request for payment has been made in accordance with applicable bar dates for such requests set by the Bankruptcy Court (if such written request is required) in each case as to which the Debtor, or any other party in interest (x) has not interposed a timely objection by the applicable Claims Objection Deadline or (y) has interposed a timely objection and such objection has been settled, waived through payment, withdrawn, or has been denied by a Final Order; provided, further, however, that for purposes of determining the status (i.e., Allowed or Disputed) of a particular Claim prior to the expiration of the period fixed for filing objections to the allowance or disallowance of Claims, any such Claim that has not been previously allowed or disallowed by a Final Order of the Bankruptcy Court or the Plan will be deemed a Disputed Claim unless such Claim is specifically identified by the Debtor as being an Allowed Claim. Unless otherwise provided in the Plan, section 506(b) of the Bankruptcy Code, or a Final Order of the Bankruptcy Court, "Allowed Claim" will not, for purposes of Distributions under the Plan, include for prepetition Claims interest or any other amounts accruing on, in connection with, or with respect to, such Allowed Claim from and after the Petition Date.

An Allowed Administrative Claim is an Allowed Claim arising under Bankruptcy Code section 507(a)(2) costs and expenses of administration of the Chapter 11 Case under Bankruptcy Code sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, to the extent not previously paid, including, but not limited to, (a) any actual and necessary costs and expenses incurred after the Petition Date, of preserving the Estate and operating the business of the Debtor (such as wages, salaries and commissions for services rendered after the commencement of the Chapter 11 Case and payments for inventory, leased equipment and premises), (b) all other claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, but excluding Priority Tax Claims and Professional Fee Claims, and (c) all fees and charges assessed against the Estate under Chapter 123 of Title 28 of the United States Code.

In no event will Administrative Claims or other Claims subject to disallowance under section 502(d) of the Bankruptcy Code be deemed to be an Allowed Claim.

    2.  Distribution Record Date Requirements

In making Distributions under the Plan, the Debtor will recognize only Holders as of the applicable Distribution Record Date. As defined in the Plan, the Distribution Record Date is the date for determining entitlement to receive Distributions under the Plan on account of Allowed Claims. For all Holders of Claims, the Distribution Record Date is the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern Time.

At the close of business on the Distribution Record Date, the claims registers for all Claims will be closed, and there will be no further changes in the record Holders of such Claims. Except as provided in the Plan, the Reorganized Debtor, the Disbursing Agent, and each of their respective agents, successors, and assigns will have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and will be entitled instead to recognize and deal for all purposes thereunder with only those record

Holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions.

        3.      Date of Distribution

All Distributions to Holders of Allowed Claims as of the applicable Distribution Date will be made on or as soon as practicable after the applicable Distribution Date. Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date will be made pursuant to Section 8.2 of the Plan and on such day as selected by the Reorganized Debtor, in its sole discretion.

Distributions made after the Effective Date will be deemed to have been made on the Effective Date. The Reorganized Debtor will have the right, in its discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances warrant. The Plan provides, however, that as to all Allowed Claims, a later date than those specifically prescribed in the Plan may be established by order of the Bankruptcy Court upon motion of the Debtor, the Reorganized Debtor or any other party.

        4.      Interest on Claims; Dividends

The Plan provides that unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest will not accrue or be paid on Claims, and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim. Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest will not accrue or be paid upon any Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Claim becomes an Allowed Claim.

        5.      Making of Distributions

The Debtor will, on or before the Effective Date, designate the Person to serve as the Disbursing Agent under the Plan on terms and conditions mutually agreeable between the Debtor and such Person. At the direction of the Reorganized Debtor, Distributions to Holders of Allowed Claims will be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor, the Reorganized Debtor, or the Disbursing Agent after the date of any related Proof of Claim or after the date of the Schedules if no Proof of Claim was filed.

If any Holder's Distribution is returned as undeliverable, a reasonable effort will be made to determine the current address of such Holder, but no further Distributions to such Holder will be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all undeliverable Distributions will be made to such Holder without interest. Unless otherwise agreed by the Reorganized Debtor and the Disbursing Agent, amounts in respect of undeliverable Distributions made by the Disbursing Agent will be returned to the Reorganized Debtor and held in trust by the Reorganized Debtor until such Distributions are claimed at which time the applicable amounts will be returned to the Disbursing Agent for Distribution pursuant to the Plan.

All claims for undeliverable Distributions must be made on or before the first (1st) anniversary of the Initial Distribution Date, after which date all unclaimed property will revert to the Reorganized Debtor free of any restrictions thereon and the claims of any Holder or successor to such Holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Except as otherwise provided in the Plan, neither the Debtor, the Reorganized Debtor nor any Disbursing Agent will be required to attempt to locate any Holder of an Allowed Claim.

48615/0001-7249352v4

(b)     The Disbursing Agent will make all Distributions required to be made to Holders of General Unsecured Claims, Convenience Claims and Trade Vendor Claims, on the respective Distribution Dates under the Plan and such other Distributions to other Holders of Claims as are delegated to the Disbursing Agent by the Reorganized Debtor. If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent will receive, without further approval from the Bankruptcy Court, reasonable compensation for Distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from the Reorganized Debtor. The Plan provides that no Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

6.     Tax Withholding, Payment, and Reporting Requirements

In connection with the Plan and all distributions under the Plan, the Disbursing Agent will, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions under the Plan will be subject to any such withholding, payment, and reporting requirements. The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder shall be treated as part of the Distributions to such Holder. All Holders of Claims shall be required to provide any information necessary to effect information reporting and withholding of such taxes. For example, with respect to any employee-related withholding, if the Debtor is obligated by law to withhold amounts from Distributions to a present or former employee to satisfy such present or former employee's tax and other payroll obligations, the Disbursing Agent may withhold a portion of the Distributions allocated to the Holder of a Claim that is a present or former employee, whether or not such Distributions are in the form of Cash, in such amount as is determined necessary to satisfy such Holder's tax and other payroll obligations with respect to the Distributions.

Notwithstanding any other provision of the Plan, (a) each Holder of a Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Disbursing Agent in connection with such Distribution. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Section 7.7 of the Plan.

7.     Setoffs

The Reorganized Debtor may, but will not be required to, set off against any Claim or any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such Holder.

8.     Means of Cash Payment

The Plan provides that Cash payments made pursuant to the Plan will be in U.S. funds, by the means agreed to by the payor and the payee, including by check or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor will determine in its sole discretion.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency will be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

9.      Fractional Distributions

The Plan provides that notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

10.      De Minimis Distributions

The Plan provides that notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent will not be required to distribute, and will not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $5.00. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $5.00 will have such Claim discharged and will be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor or its respective property. Any Cash or other property not distributed pursuant to this provision will be the property of the Reorganized Debtor, free of claims to such Cash or any restrictions thereon.

11.      Prepayment

Except as otherwise provided in the Plan, any ancillary documents entered into in connection with the Plan, or the Confirmation Order, the Reorganized Debtor will have the right to prepay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time; provided, however, that any such prepayment will not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

12.      No Distribution in Excess of Allowed Amounts

Notwithstanding anything to the contrary set forth in the Plan, no Holder of an Allowed Claim will receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Effective Date pursuant to the Plan, if any).

13.      Allocation of Distributions

All Distributions received under the Plan by Holders of Claims will be deemed to be allocated first to the accrued interest, if any, with respect to such Claim as determined for United States federal income tax purposes and then to the principal amount of such Claim.

14.      Joint Distributions

The Reorganized Debtor may, in its sole discretion, make distributions jointly to any Holder of a Claim and any other entity who has asserted, or whom the Debtor has determined to have, an interest in such Claim. Except as otherwise provided in the Plan or in the Confirmation Order, and notwithstanding the joint nature of any distribution, all distributions made by the Debtor will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties, other than rights or Claims arising under the Plan, as set forth in Section 11.10 of the Plan.

48615/0001-7249352v4

15.     Objection Procedures

All objections to Claims, other than Claims that are deemed to be Disputed, must be filed and served on the Holders of such Claims by the applicable Claims Objection Deadline. If a timely objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, unless such Proof of Claim asserts a Claim that is deemed to be a Disputed Claim, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.

With respect to Administrative Claims (other than Professional Fee Claims), the last day for Filing an objection to any Administrative Expense Request, which will be the later of (a) 90 days after the Effective Date, or (b) 90 days after the filing of such Administrative Claim, or (c) such other date specified in this Plan or ordered by the Bankruptcy Court. The filing of a motion to extend the Administrative Claims Objection Deadline will automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, the Administrative Claims Objection Deadline will be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) or 30 days after the Bankruptcy Court's entry of an order denying the motion to extend the Administrative Claims Objection Deadline, or the date with respect to an applicable statute of limitations period with respect to a Cause of Action under Chapter 5 of the Bankruptcy Code.

With respect to Unsecured Claims, the last day for filing objections to Claims will be the latest of (a) one hundred and eighty (180) days after the Effective Date, (b) thirty (30) days after entry of a Final Order under section 502(j) of the Bankruptcy Code reinstating any Claim previously disallowed, or (c) such other later date as is established by order of the Bankruptcy Court upon motion of the Debtor, the Reorganized Debtor or any other party in interest.

After the Effective Date, only the Reorganized Debtor will have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims, including Administrative Claims and Claims for reclamation under section 546(c) of the Bankruptcy Code. The Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

16.     Estimation of Contingent, Disputed or Unliquidated Claims

The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent, Disputed or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanisms.

17.     Provisions for Disputed Claims

No payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

48615/0001-7249352v4

A Disputed Claim is a Claim, or any portion thereof, that is neither an Allowed or a Disallowed Claim, for which the Disputed Claim Amount will be if a liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) the liquidated amount set forth in the Proof of Claim relating to the Disputed Claim; (ii) an amount agreed to by the Debtor or the Reorganized Debtor, as applicable, and the Holder of such Disputed Claim; or (iii) if a request for estimation is filed by any party, the amount at which such Disputed Claim is estimated by the Court. If no liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) an amount agreed to by the Debtor or the Reorganized Debtor, as applicable, and the Holder of such Disputed Claim or (ii) the amount estimated by the Court with respect to such Disputed Claim; or (iii) if the Disputed Claim was listed on the Schedules as unliquidated, contingent or disputed and no Proof of Claim was filed, or deemed to have been filed, by the applicable Bar Date and the Claim has not been resolved by written agreement of the parties or an order of the Court, zero.

The Disbursing Agent will, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim. Such Distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Such Distributions will be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

## F. Disposition of Executory Contracts and Unexpired Leases

### 1. Executory Contracts and Unexpired Leases Deemed Assumed

The Plan provides for the deemed assumption of all executory contracts or unexpired leases that have not been otherwise disposed of. Specifically, except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor will be deemed to have assumed each pre-petition executory contract and unexpired lease to which it is a party and assigned such executory contract and unexpired lease to the Reorganized Debtor unless such executory contract or unexpired lease (a) was previously assumed or rejected upon motion by a Final Order, (b) previously expired or terminated pursuant to its own terms, (c) is listed on the Schedule of rejected contracts and leases, substantially in the form annexed as Exhibit F to the Plan, or (d) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by the Debtor on or before the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court under section 365(a) of the Bankruptcy Code approving the assumption and/or assignment of pre-petition executory contracts and unexpired leases described above, as of the Effective Date. The Debtor reserves the right, at any time prior to the Confirmation Date, to seek to reject any pre-petition executory contract or unexpired lease to which the Debtors is a party by filing a revised Schedule of rejected contracts and leases.

### 2. Rejection Damages Bar Date for Rejections Pursuant to Plan

If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the claims agent and served upon counsel to the Reorganized Debtor within thirty (30) days after entry of the Confirmation Order. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease pursuant to the Plan; any other Claims held by a party to a rejected contract or lease will have been evidenced by a Proof of Claim filed by earlier applicable bar dates or will be barred and unenforceable.

48615/0001-7249352v4

3. Rejection of Executory Contracts and Unexpired Leases

Under the Plan, the Debtor reserves the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any executory contract or unexpired lease to which the Debtor is a party and to file a motion requesting authorization for the rejection of any such executory contract or unexpired lease.

4. Cure with Respect to Assumed Executory Contracts and Unexpired Leases

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that the Debtor or Reorganized Debtor, as applicable, will be authorized to reject any executory contract or unexpired lease to the extent the Debtor or Reorganized Debtor, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Debtor or Reorganized Debtor.

The foregoing applies only to assumptions that will occur pursuant to the provisions of the Plan, rather than to assumptions that will occur pursuant to separate motions. Parties to the contracts and leases proposed to be assumed under such motions have the opportunity to file an objection disputing the amount of cure designated by the Debtor in such motions. If the dispute cannot be consensually resolved, the Bankruptcy Court will determine the amount of cure the Debtor must pay to assume the contract or lease at issue.

5. Compensation and Benefit Programs

The Plan provides that except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation and benefit programs of the Debtor in effect during the pendency of the Chapter 11 Case, including all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, and all benefits subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and in effect during the pendency of the Chapter 11 Case, will be deemed to be, and will be treated as though they are, executory contracts that are assumed and assigned pursuant to section 365 of the Bankruptcy Code and under the Plan. However, the Plan does not modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.

6. Indemnification Obligations

The Plan provides that Indemnification Obligations owed to directors, officers, and employees of the Debtor (or its Estate) who served or were employed by the Debtor as of or after the Petition Date for claims arising after the Petition Date, excluding claims resulting from gross negligence, willful misconduct, breach of fiduciary duty, or intentional tort, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

The Plan further provides that all Indemnification Obligations owed to directors, officers, and employees of the Debtor who served or were employed by the Debtor prior to, but not after, the Petition Date will be deemed to be, and will be treated as though they are, executory contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Plan.

Indemnification Obligations owed to any Professionals retained pursuant to sections 327 or 328 of the Bankruptcy Code and order of the Bankruptcy Court, to the extent that such Indemnification Obligations relate to the period after the Petition Date, will be deemed to be, and will be treated as though they are, executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under the Plan.

7.      Limited Extension of Time to Assume or Reject

Under the Plan, in the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtor or the Reorganized Debtor to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired.

In the event the Debtor or the Reorganized Debtor become aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Schedule of rejected contracts and leases, the right of the Reorganized Debtor to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the date on which the Debtor or the Reorganized Debtor becomes aware of the existence of such contract or lease.

8.      Post-petition Contracts and Leases

The Plan provides that the Debtor will not be required to assume or reject any contract or lease entered into by the Debtor after the Petition Date. Any such contract or lease will continue in effect in accordance with its terms after the Effective Date, unless the Debtor has obtained a Final Order of the Bankruptcy Court approving rejection of such contract and lease.

9.      Treatment of Claims Arising From Assumption or Rejection

The Plan provides that all Allowed Claims arising from the assumption of any executory contract or unexpired lease will be treated as Administrative Claims pursuant to Section 3.1(b) of the Plan; all Allowed Claims arising from the rejection of an executory contract or unexpired lease will be treated, to the extent applicable, as General Unsecured Claims, Convenience Claims or De Minimus Claims unless otherwise ordered by Final Order of the Bankruptcy Court; and all other Allowed Claims relating to an executory contract or unexpired lease will have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

## G.      Vesting of Assets; Release of Liens, Claims and Encumbrances

Except as otherwise provided in the Plan, the property of the Debtor's Estate, including the Causes of Action, together with any property of the Debtor that is not property of its Estate and that is not otherwise specifically disposed of pursuant to the Plan, will vest in the Reorganized Debtor on the Effective Date. Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of the Reorganized Debtor will be free and clear of all Liens, Claims, and Interests, except as specifically provided in the Plan or the Confirmation Order.

**H.     Payment of General Unsecured Claims by the DIP Lender**

The Plan provides that on or before the Effective Date, the Disbursing Agent will establish, for the benefit of the Holders of the Allowed General Unsecured Claims, the General Unsecured Claim Account, which will be funded on the Effective Date by the DIP Lender with Cash in the greater of (a) the aggregate amount of $100,000.00 or (b) the then undrawn amount of the DIP Financing as of the Effective Date (the "General Unsecured Claim Account"). Each Holder of an Allowed General Unsecured Claim will receive from the General Unsecured Claim Account, its Pro Rata share of Cash on the later of (A) the Distribution Date or (B) as soon as practicable after the date a General Unsecured Claim becomes an Allowed Claim. The Plan further provides that after all payments from the General Unsecured Claim Account have been distributed, the undistributed portion of the General Unsecured Claim Account, if any, shall become the sole and exclusive property of the Reorganized Debtor.

**I.     Sale of Subsidiaries to DIP Lender**

The Plan provides the means for implementation of the Plan shall be a sale or change of control transaction for substantially all of the assets of the Reorganized Debtor to the DIP Lender as consideration for and full settlement, satisfaction, and payment of the DIP Lender's DIP Facility Claim and Intercompany Claim. On the Effective Date, the DIP Lender shall receive 100% of the New Equity of the Reorganized Debtor.

**J.     Alternative Transaction**

In the event of a sale of all or substantially all of the Debtor's assets to a party other than the DIP Lender, the proceeds from such a sale will provide the means for implementation of the Plan. The Debtor will be filing a sale motion to obtain approval of an Alternative Transaction and it will be necessary for the Debtor to consider whether an Alternative Transaction is higher or otherwise better than the consideration provided for by BNA under the Plan to obtain the New Equity.

**K.     Authorization and Issuance of New Equity**

On the Effective Date, unless an Alternative Transaction shall occur, the Reorganized Debtor will issue and deliver the New Equity to (or at the direction of) the DIP Lender or its designee.

The New Equity issued under the Plan will be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by the New Corporate Governance Documents, or applicable law, regulation, order or rule; and all documents evidencing same will be executed and delivered as provided for in the Plan or the Plan Supplement.

All New Equity to be issued will be deemed issued as of the Effective Date regardless of the date on which the New Equity is actually distributed.

**L.     Restructuring Transactions**

Under the Plan, on, as of, or after the Effective Date, with the consent of the Board of Managers, the Reorganized Debtor may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of its business, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtor, to achieve corporate or operational efficiencies, or to otherwise improve financial results; provided, however, that such transactions or actions are not otherwise inconsistent with the Plan, the Distributions to be made under the Plan, the New Subsidiaries Operating Agreement. Such transactions or actions may include such mergers, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtor to be necessary or appropriate.

35

**M.     Post-Consummation Corporate Structure, Management and Operation**

1.     Continued Corporate Existence

The Plan provides that the Reorganized Debtor will continue to exist after the Effective Date as a separate legal entity, in accordance with the applicable law of the State of Delaware and its certificate of formation.

2.     Subsidiaries Operating Agreement

The New Subsidiaries Operating Agreement will be substantially in the form of such document included in the Plan Supplement and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code.

3.     Cancellation of Old Equity Interests and Agreements

Except as otherwise provided for in the Plan, or in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, the Equity Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, other than a Claim that is being Reinstated and rendered Unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests will be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtor under the notes, share certificates and other agreements and instruments governing such Claims and Interests will be discharged; provided, however, that certain instruments, documents and credit agreements related to Claims will continue in effect solely for the purposes of allowing the agents to make Distributions to the beneficial holders and lenders thereunder.  The holders of or parties to such cancelled notes, share certificates and other agreements and instruments will have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

4.     Officers and Directors of Reorganized Debtor

The Plan provides that on and after the Effective Date and pursuant to and as set forth in detail in the New Subsidiaries Operating Agreement, the composition and terms of the current board of managers of the Debtor will continue unaffected by the Chapter 11 Case.

The Plan further provides that on and after the Effective Date, the existing senior officers of the Debtor will serve in the same capacities for the Reorganized Debtor unless and until replaced or removed in accordance with the New Subsidiaries Operating Agreement.

5.     Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtor to the Reorganized Debtor or to any other Person pursuant to the Plan in the United States will not be subject to any stamp tax or similar tax, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

48615/0001-7249352v4

6. Corporate Action

On the Effective Date, the adoption and filing of the New Subsidiaries Operating Agreement, the appointment of directors and officers of the Reorganized Debtor, and all actions contemplated will be authorized and approved in all respects pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtor or Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or directors of the Debtor or Reorganized Debtor. On the Effective Date, the appropriate officers or directors of the Reorganized Debtor are authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations, or consents, except for any express consents required under the Plan.

7. Effectuating Documents; Further Transactions

The chief executive officer or the chief financial officer or any other appropriate officer of the Reorganized Debtor will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The secretary of the Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.

## N. Releases, Discharge, Injunctions, Exculpation and Indemnification

### 1. Releases by Debtor

The Plan provides for certain releases to be granted by the Debtor in favor its non-Debtor affiliates, any of the present or former directors, officers, and employees of the Debtor or any of the Debtor's non-Debtor affiliates; any Professionals of the Debtor; and the DIP Lender and its advisors.

Specifically, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Estate, the Reorganized Debtor and any Person or Entity seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including claims or Causes of Action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever in connection with or related to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan (other than the rights of the Debtor and the Reorganized Debtor to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Reorganized Debtor, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtor, the Estate, or the Reorganized Debtor (the "Debtor Claims") against (i) any of the Debtor's non-Debtor affiliates, (ii) any of the present or former directors, officers, or employees of the Debtor or any of the Debtor's non-Debtor affiliates, (iii) any Professionals of the Debtor and (iv) the DIP Lender and its advisors.

Prior to the filing of this Disclosure Statement, the Debtor, with the assistance of its advisors, conducted an investigation of any possible Debtor Claims against its parent, BNA, and determined that the Debtor might prevail in recharacterizing some or all of the BNA Intercompany Claim as a capital contribution. In light of BNA's agreement to waive its BNA Intercompany Claim and contribute 100% of the General Unsecured Claim Distribution into the General Unsecured Claim Account as set forth in the Plan, the release

of the Debtor Claims against BNA is appropriate and in the best interests of the Debtor's estate. If there is an Alternative Transaction, the Debtor reserves the right to object to some or all of the BNA Intercompany Claim.

The Debtor does not believe that there are any valid Debtor Claims against (i) any of its present or former directors, officers, and employees, (ii) any of its Professionals, (iii) the DIP Lender or (iv) any non-Debtor affiliates (the "Additional Released Parties"). Moreover, any action brought to enforce a potential Debtor Claim against the Additional Release Parties would involve significant costs to the Debtor, including legal expenses and the distraction of the Debtor's key personnel from the demands of the Debtor's ongoing businesses. In light of these considerations, and given the contributions made by the Additional Released Parties to the Debtor's businesses and reorganization efforts, the releases of the Debtor Claims are appropriate and in the best interests of the Debtor's Estates.

2. Releases by Holders of Claims

In furtherance of the release provisions of the Plan, <u>as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the present or former directors, officers, or employees of the Debtor (collectively, the "Releasees"), in connection with or related to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan.</u>

The Plan provides that <u>each of the Releasees will be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan, that such Releasees may hold in their individual capacities against each Holder of a Claim.</u>

The releases by and among the Claim Holders pursuant to the Plan and the Releasees meet the standards of fairness and necessity to the Debtor's reorganization required to justify Court approval of non-consensual releases. <u>See</u> <u>Gillman v. Continental Airlines (In re Continental Airlines)</u>, 203 F.3d 203, 214 (3d Cir. 2000) (noting that "[t]he hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions").

3. Discharge and Discharge Injunction

Confirmation of the Plan effects a discharge of all Claims against the Debtor. As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor will (i) be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (A) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (B) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (C) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (D) the Holder of a Claim based upon such debt accepted the Plan, and (ii) terminate all Equity Interests.

Under the Plan, as of the Effective Date, all Persons will be precluded from asserting against the Debtor or the Reorganized Debtor, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor and termination of all Equity Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor or the Reorganized Debtor; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

The Plan further provides that as of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, or an Interest that is terminated, pursuant to Section 11.9, 11.10, or 11.11 of the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities, or such terminated Interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Moreover, the Plan provides that, without limiting the effect of the foregoing provisions of Section 11.12 of the Plan upon any Person, by accepting distributions pursuant to the Plan, each Holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in this Section 11.12.

The Plan further provides that nothing in Section 11.12 of the Plan will impair (i) the rights of any Holder of a Disputed Claim to establish its Claim in response to an objection filed by the Debtor or the Reorganized Debtor, or (ii) the rights of any party to an executory contract or unexpired lease that has been assumed by the Debtor pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

4.      Exculpation Relating to Chapter 11 Case

The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Case. Specifically, the Plan provides that none of the Debtor, the Reorganized Debtor, their respective non-Debtor affiliates, or any of their respective present or former members, officers, directors, employees, advisors, Professionals, or agents, will have or incur any liability to any Holder of a Claim or an Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act

or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.

Moreover, the Plan provides that no Holder of a Claim or an Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns will have any right of action against the Debtor, the Reorganized Debtor, any of the Debtor's or Reorganized Debtor's non-Debtor affiliates, or of their respective present or former members, officers, directors, employees, advisors, Professionals, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.

The exculpations contained in the Plan are appropriate and are standard in similarly-sized chapter 11 cases such as the Debtor's Chapter 11 Case. The exculpations are appropriately limited in scope, applying only to acts and omissions occurring after the Petition Date and in connection with the Chapter 11 Case or the Plan and conferring only a qualified immunity by excluding acts or omissions which are the result of fraud, gross negligence or willful misconduct. Moreover, these exculpations have, in the Debtor's view, been earned. The beneficiaries of the exculpations have made significant contributions to the Debtor's reorganization, which contributions have allowed for the formulation of the Plan which resolves many complicated issues between and among the Debtor and other interested parties and which, in the Debtor's view, provides for the best possible recoveries for Claims against the Debtor. In the Debtor's view, the beneficiaries of the exculpations would not have contributed as they did without the prospect of the limited immunity reflected in the exculpations. The Debtor is also unaware of any valid causes of action against any of the beneficiaries of the exculpations. In view of the foregoing, the exculpations are appropriate and in the best interests of the Debtor's estates.

5.      Post-Effective Date Indemnifications

The Plan provides that upon the Effective Date, the New Subsidiaries Operating Agreement will contain provisions which (i) eliminate the personal liability of the Debtor's and the Reorganized Debtor's then present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law of the State of Delaware; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtor's and the Reorganized Debtor's directors, officers, and other key employees (as such key employees are identified by the chief executive officer of the Reorganized Debtor and the Board of Managers) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law of the State of Delaware.

## O.      Retention of Jurisdiction

The Plan provides that under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder),

including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtor will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

- hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case, or the Causes of Action;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, this Disclosure Statement, or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, this Disclosure Statement, or the Confirmation Order;

- enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications,

and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

- except as otherwise limited herein, recover all assets of the Debtor and property of the Estate, wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

- enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 10.1 of the Plan, the provisions of Article X of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## P. Amendment, Alteration and Revocation of Plan

(a)     The Debtor may alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. The Debtor will provide parties-in-interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Holder.

(b)     After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtor or Reorganized Debtor, as the case may be, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; provided, however, that, to the extent required, prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Holder.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

48615/0001-7249352v4

The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, the Debtor, or any Causes of Action or other claims by or against the Debtor, or any Person or Entity, (ii) prejudice in any manner the rights of the Debtor, or any Person or Entity in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor, or any other Person or Entity.

## Q. Plan Implementing Documents

The New Corporate Governance Documents are necessary to implement the Plan. The proposed forms will be included in the Plan Supplement. The Plan Supplement will be filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing or by such later date as may be established by order of the Bankruptcy Court. Upon such filing, all documents included in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtor in accordance with Section 11.15 of the Plan.

## R. Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

### 1. Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the hearing on confirmation of the Plan (the "Confirmation Hearing") that, among others, the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtor or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtor has disclosed (a) the identity and affiliations of (i) any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting

trustee of the Reorganized Debtor, or (ii) any successor to the Debtor under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest Holders and with public policy), and (b) the identity of any insider that will be employed or retained by the Debtor and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under chapter 7 of the Bankruptcy Code. See Section X.D hereto.

- The Plan provides that Administrative Claims, Professional Fee Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Distribution Date and that Allowed Priority Tax Claims will be paid in full on the Distribution Date or will receive on account of such Allowed Claims deferred cash payments over a period not exceeding five (5) years after the date of assessment of such Allowed Priority Tax Claim in an aggregate principal amount equal to the Face Amount of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the Case Interest Rate, except to the extent that the Holder of any such Claim has agreed to another less favorable treatment. See Section VI.C.1(d) hereto.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. See Section X.A hereto.

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtor have obligated themselves to provide such benefits.

The Debtor believes that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

2.      Conditions to Confirmation Date and Effective Date

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date.

Under the Plan, the conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code will have been entered; and (b) the proposed Confirmation Order will be in form and substance reasonably satisfactory to the Debtor and the DIP Lender.

The Plan further provides that the conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Confirmation Order will have been entered in form and substance reasonably satisfactory to the Debtor and the DIP Lender, and will, among other things: (i) provide that the Debtor and the Reorganized Debtor are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan; (ii) authorize the issuance of the New Equity; (iii) provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order will be immediately effective, subject to the terms and conditions of the Plan; (b) the Confirmation Order will not then be stayed, vacated, or reversed; (c) the New Subsidiaries Operating Agreement, in form and substance reasonably acceptable to the Debtor and the DIP Lender, will have been adopted; (d) the DIP Lender will have funded the General Unsecured Claim Account, or in the event of an Alternative Transaction, the Sale will have been consummated; (e) all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan will have been obtained; and (f) all material actions, documents, and agreements necessary to implement the Plan will have been effected or executed. The Plan provides that each of the aforementioned conditions that must be satisfied on or prior to the Confirmation Date and the Effective Date, as set forth in Section 9.2 of the Plan, with the express exception of the conditions contained in Section 9.2(a)(i), (a)(ii) and (b), may be waived in whole or in part by the Debtor without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

        3.        Anticipated Effective Date

The length of time between a confirmation date and an effective date varies from case to case and depends upon how long it takes to satisfy each of the conditions precedent to the occurrence of the effective date specified in the particular plan of reorganization. Under the Debtor's Plan, of the conditions precedent set forth above, the time necessary to satisfy the conditions relating to the Exit Facility is most likely to dictate the Debtor's Effective Date.

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in **Classes 3, 4, 5, 6 and 7** should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.    General Considerations

The Plan sets forth the means for satisfying the Claims against the Debtor. Certain Claims and Interests receive no Distributions pursuant to the Plan. Nevertheless, reorganization of the Debtor's businesses and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtor's customers, suppliers, employees, communities, and other stakeholders.

## B.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor, see Section X.A hereto, and that the value of Distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. See Section X.C hereto. Although the Debtor believe that the Plan will meet such tests, there can be no

assurance that the Bankruptcy Court will reach the same conclusion. <u>See</u> Section X.D for a liquidation analysis of the Debtor.

The Debtor's future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtor's operating results, as the Debtor's ability to obtain financing to fund its operations and its relations with customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders, customers, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

## C.     Claims Estimations

The Debtor reserves the right to object to the amount or classification of any Claim or Interest except any such Claim or Interest that is deemed Allowed under the Plan or except as otherwise provided in the Plan. There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

## D.     Conditions Precedent to Consummation; Timing

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## E.     Inherent Uncertainty of Financial Projections

The Projections set forth in the attached Appendix B cover the operations of the Reorganized Debtor through fiscal year 2013. These Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections

have not been audited, reviewed, or compiled by the Debtor's independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors, or any other Person that the Projections can or will be achieved.

**F.      Certain Risk Factors Relating to Securities to be Issued Under the Plan**

        1.      No Current Public Market for Securities

The New Equity to be issued pursuant to the Plan are securities for which there is currently no market, and there can be no assurance as to the development or liquidity of any market for the New Equity. If a trading market does not develop or is not maintained, any holders of the New Equity may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for the Reorganized Debtor.

Furthermore, Persons to whom the New Equity is issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, any market that does develop for such securities may be volatile. Other factors, such as the current intention of the Reorganized Debtor not to pay dividends for the foreseeable future, may further depress any market for the New Equity.

        2.      Dividends

The Debtor does not anticipate that cash dividends or other distributions will be paid with respect to the New Equity in the foreseeable future.

        3.      Change of Control

The New Subsidiaries Operating Agreement may contain provisions that may have the effect of delaying, deterring, or preventing a change in control of the Reorganized Debtor.

**G.      Competition**

Like the Debtor, the Reorganized Debtor will face intense competition, which could harm its financial condition and results of operations. The Reorganized Debtor must compete based on product quality, variety and price, as well as service and convenience.

The Reorganized Debtor's ability to respond to the entry of new competitors into its markets thus represents an additional risk factor.

**H.      Litigation**

The Reorganized Debtor will be subject to various claims and legal actions arising in the ordinary course of its businesses. The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtor.

**I.      Adverse Publicity**

Adverse publicity or news coverage relating to the Reorganized Debtor, including but not limited to publicity or news coverage in connection with the Chapter 11 Case, may negatively impact the Debtor's efforts to establish and promote name recognition and a positive image after the Effective Date.

**J.  Certain Tax Considerations**

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Section IX of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and the Reorganized Debtor and to certain Holders of Claims who are entitled to vote to accept or reject the Plan.

## VIII.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

**A.  Exemption From Registration Requirements For New Equity**

The Debtor will rely on section 1145 of the Bankruptcy Code to exempt the issuance of the New Equity from the registration requirements of the Securities Act and any state securities laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of the debtor or a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, the debtor or a successor to the debtor under the Plan. The Debtor believes that the Reorganized Debtor is a successor to the Debtor under the Plan for purposes of section 1145 of the Bankruptcy Code and that the offer of the New Equity under the Plan satisfies the requirements of section 1145 and is therefore exempt from the registration requirements of the Securities Act and state securities laws.

**B.  Subsequent Transfers of New Equity**

In general, recipients of the New Equity will be able to resell the New Equity without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder of such stock is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, the New Equity generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, the recipients of the New Equity issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an "issuer" of the relevant security, as such term is used in Section 2(11) of the Securities Act. Under Section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.

To the extent that recipients of the New Equity under the Plan are deemed to be "underwriters," such persons cannot rely on the exemption from registration under the Securities Act provided by Section 4(1) of that Act for resales of the New Equity. Persons deemed to be underwriters may, however, be permitted to sell such New Equity or other securities without registration pursuant to the provisions of Rule 144 under the Securities Act. This rule permits the public resale of securities received by "underwriters" pursuant to a chapter 11 plan subject to applicable conditions, which may include holding periods, availability of information regarding the issuer, volume limitations, restrictions on manner of sale, and/or notice requirements.

48615/0001-7249352v4

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER WITH RESPECT TO THE NEW EQUITY, THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE SHARES OF NEW EQUITY ISSUED UNDER THE PLAN. THE DEBTOR RECOMMENDS THAT THE RECIPIENTS OF NEW EQUITY UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT.

## IX. CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A. Certain Tax Considerations

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in this Article IX. regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and the Reorganized Debtor and to certain holders of Claims who are entitled to vote to accept or reject the Plan.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, you are hereby notified that: (a) any discussion of U.S. federal tax issues in this Disclosure Statement (including all appendices thereto) is not intended or written be relied upon, and cannot be relied upon, by creditors for the purpose of avoiding penalties that may be imposed on such creditors under the Internal Revenue Code; (b) such discussion is not written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) each creditor should seek advice based on its particular circumstances from an independent tax advisor.

### B. General

The following discussion addresses certain United States federal income tax consequences of the consummation of the Plan. This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively. No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Debtor with respect to the Plan.

An opinion of counsel has not been obtained with respect to the tax aspects of the Plan. This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST. SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX ISSUES DISCUSSED BELOW. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### C. Certain U.S. Federal Tax Consequences to the Debtor

The Debtor's business is operated through a limited liability company (the "LLC") which is owned 100% by its parent, BNA. Based upon discussions with management of the Debtor, the LLC is a "disregarded entity" for income tax purposes and therefore, it pays no income tax and the income or loss passes

49

through and is reported entirely on the 100% owner's corporate tax return. To the best of the Debtor's knowledge and upon information and belief, the LLC does not owe any income taxes, and there are no past due employment taxes or other ancillary taxes. As a result of this structure, the Debtor does not anticipate that it will incur any federal or state income tax consequences associated with implementing the Plan.

If cancellation of indebtedness ("COD") income is generated as a result of the implementation of the Plan, then such COD income may be recognized as income to BNA unless otherwise excludible under the Tax Code. BNA is not currently in a bankruptcy proceeding or insolvent, and may not qualify under any other permissible exclusion under Tax Code §108, or any other provision of the Tax Code. Therefore, it is possible that BNA may realize COD income on the disposition of all or a portion of the Debtor's obligations.

## D.    Certain U.S. Federal Tax Consequences to the Holders of Claims and Equity Interests

A Holder of an Allowed Claim or Equity Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim or Equity Interest. A Holder of an Allowed Claim or Equity Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received). The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder of the Claim, the nature of the Claim or Equity Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim or Equity Interest. If the Claim or Equity Interest in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder of the Claim is a non-corporate taxpayer and held such Claim or Equity Interest for longer than one year or short-term capital gain or loss if the Holder of the Claim held such Claim or Equity Interest for less than one year.

A Holder of an Allowed Claim or Equity Interest who receives, in respect of its Claim or Equity Interest, an amount that is less than its tax basis in such Claim or Equity Interest may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Equity Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim or Equity Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim or Equity Interest. Holders of Claims or Equity Interests who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim or Equity Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

## E.    Importance of Obtaining Professional Tax Assistance

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and not a substitute for careful tax planning with a tax professional. Holders of Claims or Equity Interests are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan, including, in addition to the issues discussed above, whether a bad debt deduction may be available with respect to their Claims or Equity Interests and, if so, when such deduction or loss would be available.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

## X.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.    Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support its belief in the feasibility of the Plan, the Debtor has relied upon the Projections, which are annexed to this Disclosure Statement as Appendix B.

The Projections indicate that the Reorganized Debtor should have sufficient cash flow to fund its operations. Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtor's independent public accountants. The Debtor will be required to adopt "fresh start" accounting upon its emergence from chapter 11. The actual adjustments for "fresh start" accounting that the Debtor may be required to adopt upon emergence, may differ substantially from those "fresh start" adjustments in the Projections. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors, or any other Person that the Projections can or will be achieved.

48615/0001-7249352v4

The Projections should be read together with the information in Section VII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

The Debtor does not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

The Debtor will face a number of risks with respect to its continuing business operations upon emergence from chapter 11, including but not limited to the following: the Debtor's ability to improve profitability and generate positive operating cash flow; the Debtor's response to the entry of new competitors into its markets; the Debtor's ability to reduce the level of operating losses experienced in recent years; the Debtor's ability to upgrade its information systems and implement new technology and business processes; the Debtor's ability to implement new customer service programs; the Debtor's ability to implement effective pricing and promotional programs; the Debtor's ability to successfully implement effective business continuity; changes in federal, state or local laws or regulations; general economic conditions; stability of product costs; increases in labor and employee benefit costs, such as health care expenses; changes in accounting standards, taxation requirements and bankruptcy laws.

## B.     Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in Classes 3, 4, 5 and 6 will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

Due to BNA's equity ownership interest in the Debtor, BNA, as the Holder of a Class 6 Intercompany Claim could be considered an "insider" of the Debtor under section 101(31) of the Bankruptcy Code, and its vote accordingly cannot be counted in meeting the confirmation requirement under section 1129(a)(10) that a plan be accepted by at least one impaired class of claims. In addition, the Holders of the Class 7 Other Intercompany Claims are affiliates of the Debtor and their votes accordingly cannot be counted in meeting the confirmation requirement under section 1129(a)(10) that a plan be accepted by at least one impaired class of claims.

## C.     Best Interests Test

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

48615/0001-7249352v4

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the chapter 11 cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

## D. Liquidation Analysis

For purposes of the Best Interests Test, in order to determine the amount of liquidation value available to Creditors, the Debtor prepared a liquidation analysis (the "Liquidation Analysis"), which concludes that in a chapter 7 liquidation, Holders of Impaired Claims and Interests would receive less of a recovery than the recovery they would receive under the Plan. This conclusion is premised upon the assumptions set forth in the Liquidation Analysis, which the Debtor believes are reasonable.

Notwithstanding the foregoing, the Debtor believes that any liquidation analysis with respect to the Debtor is inherently speculative. The Liquidation Analysis for the Debtor necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtor's review of the Claims filed and the Debtor's books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims that represents its best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Distribution to be made on account of Allowed Claims under the Plan.

The full Liquidation Analysis is annexed as Appendix C to this Disclosure Statement.

48615/0001-7249352v4

**E.      Valuation of the Reorganized Debtor**

Solely for purposes of the Plan, SSG has estimated that the enterprise value of the Reorganized Debtor falls in a range between approximately $1.1 million to $1.2 million. This estimated range of value represents hypothetical values that reflect the estimate intrinsic value of the Reorganized Debtor derived through the application of various valuation techniques.

The valuation of the Reorganized Debtor is based on a number of assumptions, including the following assumptions and/or methodologies:

- The Debtor will emerge from chapter 11 on or prior to March 31, 2011.

- The Debtor's Projections were prepared reasonably and in good faith on a basis reflecting the Debtor's best estimates and judgment as to future operating and financial performance.

- No independent evaluation or appraisal of the Debtors assets was sought or obtained in connection with the preparation of the Valuation.

The full valuation is annexed as Appendix E to this Disclosure Statement.

**F.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with any specificity the value each Holder of an Unsecured Claim will receive as a percentage of its Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor believes that the financial disclosures and projections contained in this Disclosure Statement imply a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. A Waterfall Recovery Analysis is annexed hereto as Appendix D. The Waterfall Recovery Analysis is based upon the Plan. Confirmation of the Plan will provide creditors with a recovery that is greater than creditors would receive in a liquidation in a hypothetical chapter 7 case. Creditors will receive better recovery through the distributions contemplated by the Plan because the continued operation of the Debtor as a going concern rather than a forced liquidation will allow realization of more value for the Debtor's assets. Moreover, as a result of the reorganization of the Debtor, creditors such as the Debtor's employees would retain their jobs and most likely make few if any other claims against the Debtor's estate. All of these factors lead to the conclusion that recoveries under the Plan would be greater than the recoveries available in a chapter 7 liquidation. Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**G.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

In view of the deemed rejection by Holders of Classes 8 and 9, the Debtor will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtor believes the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes 8 and 9. Such Classes include Claims or Interests that are not entitled to payment under the absolute priority rule until all other Creditors have been paid in full. Because all Holders of Claims and

48615/0001-7249352v4

Interests in Classes 8 and 9 are similarly treated, there is no unfair discrimination with respect to such Holders of Claims and Interests.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtor believes that it will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Class 8 and Holders of Interests in Class 9 in that no holders of junior claims or interests will receive Distributions under the Plan.

As to Classes 3, 4, 5, 6 and 7, and in the event it becomes necessary to "cramdown" the Plan over the rejection of any such Classes, the Debtor will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes. The fair and equitable test set forth above for unsecured claims applies to Classes 3, 4, 5, 6 and 7. The treatment proposed for Classes 3, 4, 5, 6 and 7 satisfies the fair and equitable test and can be crammed down, if necessary.

## XI.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believe that the Plan affords Holders of Claims in Classes 3, 4, 5, 6 and 7 the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.     Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtor's businesses or an orderly liquidation of assets.

The Debtor believes that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

### B.     Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtor's cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtor.

The Debtor believes that in a liquidation under chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets. More importantly, conversion to chapter 7 liquidation would likely result in the immediate cessation of the Debtor's businesses, as most chapter 7 trustees are disinclined to continue operations.

The Debtor could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtor's assets theoretically could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtor's businesses incur operating losses, the Debtor's efforts to liquidate its assets over a longer period of time theoretically could result in a lower net distribution to Creditors than it would receive through chapter 7 liquidation. Nevertheless, because there would be no need to appoint a chapter 7 trustee and to hire new professionals, chapter 11 liquidation might be less costly than chapter 7 liquidation and thus provide larger net distributions to creditors than in chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain.

Although preferable to a chapter 7 liquidation, the Debtor believes that any alternative liquidation under chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated by the Plan.

## XII. THE SOLICITATION; VOTING PROCEDURES

### A. Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest and (b) the claim or interest is "impaired" by the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### B. Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims in Classes 3, 4, 5, 6 and 7 are entitled to vote to accept or reject the Plan. By operation of law, each unimpaired Class of Claims is deemed to have accepted the Plan and each impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan.

48615/0001-7249352v4

Consequently, Classes 1 and 2 are deemed to have accepted the Plan and Classes 8 and 9 are deemed to have rejected the Plan; and, therefore, none of the Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

## C.      Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by the Voting Agent and the Debtor in its sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtor reserves the absolute right to contest the validity of any such withdrawal. The Debtor also reserves the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## D.      Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by the Voting Agent in a timely manner at BNA Subsidiaries, LLC Ballot Processing Center, c/o LOGAN & COMPANY, INC., 546 Valley Road, Upper Montclair, NJ 07043. The Debtor intends to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtor (in consultation with the Creditors Committee) expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

48615/0001-7249352v4

**E.      Voting Objection Deadline**

Pursuant to Bankruptcy Rule 3018(a), the deadline for the Debtor to file and serve any objections to Claims (each a "Voting Objection") to temporarily allow a Claim for purposes of voting on the Plan in a different class or different amount than is set forth in the Proof of Claim timely filed by the Solicitation Record Date will be [_____], 2011 at 4:00 p.m. (Eastern) (the "Voting Objection Deadline"). Any party with a response to a Voting Objection may be heard at the Confirmation Hearing. Responses to any Voting Objection may be filed with the Court up to and including the Confirmation Hearing Date. If, and to the extent that, the Debtor and such party are unable to resolve the issues raised by the Voting Objection on or prior to the Confirmation Hearing Date, any such Voting Objection will be heard at the Confirmation Hearing.

**F.      Further Information; Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

LOGAN & COMPANY, INC.
546 Valley Road
Upper Montclair, NJ 07043
Telephone: (973) 509-3190

WEBSITE: http://www.loganandco.com

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all Holders of Claims in Classes 3, 4, 5, 6 and 7 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before 4:00 p.m. Eastern Time on the Voting Deadline.

Dated: December 30, 2010

**BNA SUBSIDIARIES, LLC**

By: _____
Name: Bradford Smith
Title: Chief Operating Officer

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**

By: _____
Norman L. Pernick
Marion M. Quirk
Karen Grivner
500 Delaware Avenue,
Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Fascimile: (302) 574-2107

Attorneys for BNA Subsidiaries, LLC

# APPENDIX A

# PLAN OF REORGANIZATION OF
# BNA SUBSIDIARIES, LLC

**The Plan has been filed separately.**

# APPENDIX B

# PRO FORMA FINANCIAL PROJECTIONS

|  | 2011 | 2012 | 2013 |
|---|---|---|---|
| **ASSETS** | | | |
| Current Assets | | | |
| Cash | $ 1,005,174 | $ 1,130,506 | $ 2,257,240 |
| Customer Accounts Receivable, net | 1,374,795 | 1,512,457 | 1,663,912 |
| Inventories | 37,494 | 41,249 | 45,379 |
| Prepaid Expenses | 495,032 | 485,740 | 528,502 |
| Short Term Def Taxes | 0 | 0 | 0 |
| Due from(to) BNA | 0 | 0 | 0 |
| Total Current Assets | 2,912,495 | 3,169,951 | 4,495,034 |
| | | | |
| Property & Equipment | | | |
| Furniture, Fixtures & Equipment | 1,964,194 | 1,986,694 | 2,009,194 |
| Accumulated Depreciation | (1,882,210) | (1,950,810) | (2,004,010) |
| Net Property & Equipment | 81,984 | 35,884 | 5,184 |
| | | | |
| Other Assets | | | |
| Intangible Assets - Mgmt Network A/R | 750,000 | 500,000 | 250,000 |
| Intangible Assets - Other | 101,355 | 101,355 | 101,355 |
| Security Deposit | 13,811 | 13,811 | 13,811 |
| Def Income Taxes-Long Term | 0 | 0 | 0 |
| Total Other Assets | 865,166 | 615,166 | 365,166 |
| | | | |
| Total Assets | $ 3,859,645 | $ 3,821,002 | $ 4,865,384 |
| | | | |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | | |
| Current Liabilities | | | |
| Pre-Petition Accounts Payable & Accrued Expenses | 0 | 0 | 0 |
| Pre-Petition Critical Vendor Accounts Payable | 0 | 0 | 0 |
| Post-Petition Accounts Payable & Accrued Expenses | 757,055 | 731,307 | 756,727 |
| Due to Management Network | 0 | 0 | 0 |
| Employee Compensation & Benefits Payable | 560,158 | 560,158 | 560,158 |
| Post Retirement Benefits | 0 | 0 | 0 |
| Income Taxes Payable | 0 | 0 | 0 |
| Sales & Use Tax Payable | 0 | 0 | 0 |
| Deferred Subscription Revenue | 4,329,755 | 4,036,589 | 4,368,613 |
| Other Deferred Revenue | 755,740 | 815,702 | 880,804 |
| Interest/Penalty | 0 | 0 | 0 |
| Total Current Liabilities | 6,402,709 | 6,143,756 | 6,566,302 |
| | | | |
| Deferred Income Taxes | 0 | 0 | 0 |
| Total Liabilities | 6,402,709 | 6,143,756 | 6,566,302 |
| | | | |
| Total Stockholder's Equity | (2,543,064) | (2,322,755) | (1,700,918) |
| | | | |
| Total Liabilities & Stockholder's Equity | $ 3,859,645 | $ 3,821,001 | $ 4,865,384 |

| | **2011** | **2012** | **2013** |
|---|---|---|---|
| Operating Revenue | | | |
| Consulting Magazine | $ 1,594,031 | $ 1,809,336 | $ 2,059,191 |
| Consulting | 4,166,045 | 4,583,202 | 5,042,158 |
| G-2 | 3,391,354 | 3,573,818 | 3,765,882 |
| Green Markets | 2,391,159 | 2,640,025 | 2,912,152 |
| Institute Lists | 174,850 | 100,000 | 100,000 |
| JobSeeker | 866,600 | 50,000 | 0 |
| PSO | 416,367 | 0 | 0 |
| Total Operating Revenue | 13,000,406 | 12,756,380 | 13,879,383 |
| | | | |
| Operating Expenses | | | |
| Editorial | 3,333,364 | 3,314,758 | 3,447,348 |
| Production | 3,148,285 | 2,959,008 | 3,047,778 |
| Distribution | 728,400 | 691,061 | 711,793 |
| Total Operating Expenses | 7,210,048 | 6,964,827 | 7,206,919 |
| | | | |
| Gross Margin | 5,790,357 | 5,791,553 | 6,672,464 |
| | | | |
| Sales | 4,469,033 | 4,209,981 | 4,378,380 |
| G&A | 1,154,161 | 1,141,961 | 1,193,678 |
| Depreciation | 68,600 | 68,600 | 53,200 |
| | | | |
| Operating Profit | 98,563 | 371,011 | 1,047,206 |
| | | | |
| EBITDA | 167,163 | 439,611 | 1,100,406 |
| | | | |
| Adjustments | 57,231 | 0 | 0 |
| | | | |
| Adjusted EBITDA | 224,394 | 439,611 | 1,100,406 |
| | | | |
| Non-Operating Income/(Expense) | | | |
| Interest Income - BNA | 0 | 0 | 0 |
| Interest Income - Others | 0 | 0 | 0 |
| Net Miscellaneous Income (Expense) | 0 | 0 | 0 |
| Gains/(Losses) on Disposal of Assets | 0 | 0 | 0 |
| Total Non-Operating Income (Expense) | 0 | 0 | 0 |
| | | | |
| Income Before Taxes | 98,563 | 371,011 | 1,047,206 |
| | | | |
| Provision for Income Taxes  40.62% | (40,036) | (150,703) | (425,369) |
| | | | |
| Net Income (Loss) | $ 58,528 | $ 220,309 | $ 621,837 |

| | 2011 | 2012 | 2013 |
|---|---|---|---|
| Net Income to Common | $ 58,528 | $ 220,309 | $ 621,837 |
| **Cash Flow from Operating Expense** | | | |
| Depreciation | 68,600 | 68,600 | 53,200 |
| Change in Working Capital | | | |
| Change in Accounts Receivable | (46,979) | (137,662) | (151,455) |
| Change in Inventories | (3,175) | (3,754) | (4,131) |
| Change in Prepaid Expenses | 33,888 | 9,292 | (42,762) |
| Change in Short-Term Deferred Tax Asset | 0 | 0 | 0 |
| Change in Intangible Assets - Mgmt Network A/R | 250,000 | 250,000 | 250,000 |
| Change in Pre-Petition Accounts Payable & Accrued Expenses | 0 | 0 | 0 |
| Change in Post-Petition Accounts Payable & Accrued Expenses | 206,666 | (25,748) | 25,420 |
| Change in Due to Management Network | 0 | 0 | 0 |
| Change in Employee Compensation & Benefits Payable | 0 | 0 | 0 |
| Change in Post Retirement Benefits | 0 | 0 | 0 |
| Change in Income Taxes Payable | 0 | 0 | 0 |
| Change in New York Sales & Use Tax Payable | (93,000) | 0 | 0 |
| Change in Deferred Subscription Revenue | (186,113) | (293,166) | 332,024 |
| Change in Other Deferred Revenue | 5,740 | 59,962 | 65,102 |
| Change in Interest/Penalty | 0 | 0 | 0 |
| Change in Deferred Income Taxes | 0 | 0 | 0 |
| Net Cash Flow from Operations | $ 235,627 | $ (72,477) | $ 527,398 |
| **Cash Flow from Investing Activities** | | | |
| Capital Expenditures | $ (45,000) | $ (22,500) | $ (22,500) |
| Net Cash from Investing | $ (45,000) | $ (22,500) | $ (22,500) |
| **Cash Flow from Financing Activities** | | | |
| Due from(to) BNA | $ - | $ - | $ - |
| Net Cash from Financing | $ - | $ - | $ - |
| Net Increase/(Decrease) in Cash | 249,155 | 125,332 | 1,126,735 |
| Beginning Cash Balance | 756,019 | 1,005,174 | 1,130,506 |
| Ending Cash Balance | $ 1,005,174 | $ 1,130,506 | $ 2,257,240 |

**APPENDIX C**

**LIQUIDATION ANALYSIS**

# LIQUIDATION ANALYSIS

This Liquidation Analysis assumes that a chapter 7 Trustee does not implement the distribution to creditors set forth in the Plan. The Debtor believes that the Plan satisfies the "best interest of creditors" test that is set forth in section 1129(a)(7) of the Bankruptcy Code with respect to each impaired class under the Plan. There are multiple impaired Classes under the Plan: (a) Class 3 (General Unsecured Claims); (b) Class 4 (Convenience Claims); (c) Class 5 (Trade Vendor Claims); (d) Class 6 (BNA Intercompany Claim); (e) Class 7 (Other Intercompany Claims); (f) Class 8 (De Minimus Claims) and (g) Class 9 (Equity Interests). The Debtor believes that these Classes will receive at least as much as they would if the Debtor's assets were liquidated through a case under chapter 7 of the Bankruptcy Code. The Debtor believes this Liquidation Analysis and the conclusions set forth herein are fair and accurate, and represent management's best judgment, in consultation with its financial advisor, SSG Capital Advisors, LLC, with regard to the results of a liquidation of the Debtor.

The Liquidation Analysis was prepared by management of the Debtor, with the assistance of SSG Capital Advisors, LLC. The Liquidation Analysis is based on the Debtor's unaudited and preliminary balance sheet as of November 6, 2010 and is predicated on the assumption that the Debtor would file a chapter 7 case under the Bankruptcy Code on or about March 31, 2011. The Liquidation Analysis assumes that the actual November 6, 2010 balance sheet, with certain adjustments based upon the specifics of the case and on seasonal trends, is a proxy for the March 31, 2011 balance sheet.

It also assumes that the liquidation of the Debtor would be completed by a chapter 7 trustee during a four to six month period after the March 31, 2011 commencement date, during which time all of the Debtor's major assets would either be conveyed to the respective lien holders or sold and initial distributions to creditors would be made, net of liquidation-related costs. The liquidation period would allow for the collection of receivables, the orderly sale or abandonment of fixed assets and potentially an orderly wind-down of daily operations. For certain assets, estimates of the liquidation values were made for each asset individually. For other assets, liquidation values were assessed for general classes of assets by estimating the percentage recoveries that a trustee might achieve through an orderly disposition. It is presumed that over an additional 12 month period, the chapter 7 trustee would resolve all claims and other matters involving the Debtor's estates and make additional distributions.

The claims arising under the DIP Financing are secured by liens on substantially all of the Debtor's assets. The Debtor does not believe that there are any Class 2 Claims (Other Secured Claims). Proceeds from the liquidation of these assets are assumed to be applied first to the DIP Facility Claim, second to pay administrative and priority claims and third to fund distributions to holders of general unsecured claims.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, that would be realized if the Debtor was to be liquidated in an orderly manner through a chapter 7 process. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management of the Debtor and by the Debtor's professionals, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtor, its management and its professionals. Additionally, assumptions are made with respect to certain liquidation decisions which could be subject to change. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WAS, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

The Liquidation Analysis assumes that liquidation proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. If a chapter 7 liquidation were pursued for the Debtor, the amount of liquidation value available to unsecured creditors would be reduced, first, by the costs of the liquidation, including fees and expenses of the trustee appointed to manage the liquidation, fees and expenses of other professionals retained by the trustee to assist with the liquidation and asset disposition expenses, second, by the claims of secured creditors to the extent of the value of their collateral and third, by the priority and

administrative costs and expenses of the bankruptcy estate, including unpaid operating expenses incurred during the chapter 11 case and any accrued and unpaid professional fees allowed in the chapter 7 case.

The liquidation itself would trigger certain priority payments that would be made in full before any distribution of proceeds to pay general unsecured claims or to make distributions in respect of equity interests. The liquidation would likely prompt certain other events to occur, including the rejection of remaining executory contracts and unexpired leases, including real property and equipment leases, and defaults under agreements with customers to provide products and services. Such events would likely create additional unsecured creditors and would subject the chapter 7 estate to additional claims for damages for breaches of those contracts or for the rejection of those contracts under the Bankruptcy Code. Such claims could potentially materially increase the amount of general unsecured claims against the Debtor. No attempt has been made to estimate each and every additional general unsecured claim that might result in the event of liquidation.

The Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims, but generally assumes that Disputed Claims against the Debtor will be resolved in favor of the Debtor. Accordingly, estimates for various classes of Claims are based upon the Company's own books and records and certain filed claims. No order or finding has been entered by any Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in this Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected amounts of certain Claims that are consistent with the estimated Claims reflected in the Plan with certain modifications as specifically discussed herein.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions.

The table below summarizes the recovery estimates for proceeds that would be available for distribution in the Debtor's hypothetical chapter 7 bankruptcy case.

*(in thousands)*

| | Notes | Book Value as of Nov 6, 2010[1] | Total Liquidation Value Estimated Recovery | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Low | | High | |
| | | $ | $ | % | $ | % |
| Cash and Cash Equivalents[2] | A | $ - | $ - | 100% | $ - | 100% |
| AR[3] | B | 1,398 | 909 | 65% | 1,048 | 75% |
| Inventory[4] | C | 30 | 0 | 0% | 1 | 5% |
| PP&E, Net[5] | D | 269 | 13 | 5% | 27 | 10% |
| Publications and Intangible Assets | E | 1,439 | NA | NA | NA | NA |
| Note Receivable[6] | E | 1,000 | 400 | 40% | 500 | 50% |
| Other Intangible Assets[7] | E | 439 | 0 | 0% | 0 | 0% |
| Titles/Customer Lists | F | NA | NA | NA | NA | NA |
| Green Markets[8] | F | N/A | 0 | N/A | 777 | N/A |
| G2[9] | F | N/A | 0 | N/A | 208 | N/A |
| Consulting/KCRA[10] | F | N/A | 75 | N/A | 100 | N/A |
| Deposits | G | 14 | 14 | 100% | 14 | 100% |
| Gross Liquidation Proceeds | | $ 3,149 | $ 1,411 | N/A | $ 2,676 | N/A |
| | | | | | | |
| Less: Wind-down Costs (Costs Associated with Liquidation) | | | | | | |
| Payments from Restricted Cash[11] | H | | (51) | | (51) | |
| Chapter 7 Trustee Fees[12] | H | | (42) | | (80) | |
| Professional Fees[13] | H | | (50) | | (50) | |
| Wind Down Costs[14] | H | | (270) | | (503) | |
| | | | | | | |
| **Estimated Total Net Liquidation Proceeds Available for Distribution** | | | $ 998 | | $ 1,992 | |

| **Waterfall:** | | Claim | Recovery | Claim | Recovery |
| --- | --- | --- | --- | --- | --- |
| DIP Loan Repayment | I | $ 924 | 100.0% | $ 924 | 100.0% |
| Post Petition Liabilities | J | 982 | 7.5% | 982 | 100.0% |
| Priority Non Tax Claims | K | 30 | 0.0% | 30 | 100.0% |
| Priority Tax Claims | K | 50 | 0.0% | 50 | 100.0% |
| General Unsecured | L | 8,858 | 0.0% | 8,858 | 20.3% |
| Assumed Deferred Subscription Liability | L | 1,795 | 0.0% | 1,795 | 100.0% |
| Other General Unsecured | L | 7,062 | 0.0% | 7,062 | 0.1% |
| **Total Claims/Recovery** | | $ 10,843 | 9.2% | $ 10,843 | 34.9% |

[1] November 6th balance sheet (latest available) used to estimate the book value of assets at March 31st, 2011.

[2] Based on latest 13 week cash flow, the Company's cash balance is projected to be $0 on March 31st, 2011.

[3] All receivables are related to the KCRA and Consulting businesses and recovery rates reflect that the businesses will cease operations.

[4] Inventory is comprised of hard copies of an outdated directory and some hard copy research reports.

[5] Furniture and fixtures including desks, chairs and desktop computers.

[6] $1.0MM of the Intangible Assets is a receivable from the sale of the Corporate Finance division which is estimated to be collectible over a 3-4 year period. Liquidation analysis assumes that Company will sell the note at a discount with an implied discount rate of 35-40%.

[7] Other intangibles represent primarily goodwill and IP from previous transactions that no longer retain value.

[8] Management estimates that Green Markets will either not be sold on an expedited bases and therefore result in a recovery of $0, or will be sold on an expedited basis for 0.5 x Revenue, less the cost to fulfill Deferred Revenue ( $1.4MM) obligations.

[9] Management estimates that G2 will either not be sold on an expedited basis and therefore result in a recovery of $0, or will be sold on an expedited basis for 0.4 x Revenue, less the cost to fulfill Deferred Revenue ( $0.4MM) obligations.

[10] Consulting Magazine generates limited revenue through sales of advertising space; management estimates that the business could be sold on an expedited basis for $75K-$100K

[11] $51K of the Company's $840K in cash is related to the rental of third party customer lists and is deemed to be held in trust and due to third parties.

[12] Estimated at 3% of gross liquidation proceeds.

[13] Estimated at 3% of of the gross liquidation value of Customer List/Title sales, inventory, Intangible Assets with a minimum fee of $50K.

[14] Wind down costs are estimated by management based on 6 months at a reduced footprint in New Hampshire with 6-7 employees to liquidate AR and aid in the sale of titles/customer lists.

# NOTES TO LIQUIDATION ANALYSIS

*Note A – Cash and Cash Equivalents*

The Liquidation Analysis assumes that operations during the liquidation period would cease and, accordingly, would not generate additional cash available for distribution except for net proceeds from the disposition of non-cash assets. Based upon a hypothetical chapter 7 liquidation commencing on March 31, 2011, Debtor's management assumes no cash and cash equivalent balance as operational expenses will consume any cash generated by the Debtor. The Liquidation Analysis assumes no cash will be available upon commencement of a liquidation.

The Debtor projects to have $51,000 in restricted cash on March 31, 2011, which represent cash collections for third parties related to the Debtor's list rental business line.

*Note B – Accounts Receivable*

The analysis of accounts receivable assumes that a chapter 7 trustee would retain certain existing staff of the Debtor and maintain an ongoing collection effort for outstanding trade accounts receivable for the Debtor. Collectible accounts receivable are assumed to include all accounts receivable held by the Debtor.

Given that the liquidation analysis assumes the business will cease to operate while a select number of divisions are sold or also liquidated, the liquidation value of accounts receivable is estimated to be approximately 65% to 75% of the net book value of the accounts receivable.

*Note C – Inventory*

Inventory includes stock industry reports and directories. Given the age of the reports and directories, the liquidation analysis assumes a recovery value of 0% to 5%.

*Note D –Furniture Fixtures and Equipment (collectively "FF&E")*

FF&E includes all, furniture and fixtures and other Machinery and Equipment owned by the Debtor and used in the operation of the Debtor's business. The bulk of the FF&E represents computer and related equipment and office furniture. Given its age and condition and considering its highest and best use, the liquidation analysis assumes a recovery value of 5% to 10% of book value.

*Note E – Publications and Intangible Assets*

Publications and Intangible assets are a mix of goodwill from previous transactions and a third party receivable related to the sale of the Corporate Finance business unit to Management Networks, LLC. The liquidation analysis provides no value for the goodwill. Due to the nature of the third party receivable, which is structured so that the Debtor receives a percentage of revenues over a projected three or four year period, the liquidation analysis assumes the receivable is sold at an implied discount rate approximating 35-40%, which results in a recovery approximating 40% to 50% of book value..

*Note F – Catalog Titles*

The liquidation analysis assumes that the business operations will cease commencing with the filing of chapter 7. The analysis presumes, however, that a chapter 7 trustee will attempt to sell the more attractive publications, including Green Markets and G2 and Consulting Magazine on an expedited basis. Both Green Markets and G2 are publications that have a growing subscriber base and management believes in a shut down scenario there may be an opportunity for the titles to be sold at 40% to 50% of revenues, less the estimated cost of fulfilling the related Deferred Revenue Subscription liability. Therefore, the range of values for Green Markets would be $0 to $777,000, and the range for G2 would be $0 to $208,000. The liquidation analysis also assumes that Consulting Magazine would lose a significant amount of the contributors to competitors, and the title could be sold for $75,000 to $100,000.

*Note G – Deposits*

Deposits represent Security Deposits on leaseholds. The analysis assumes that any such deposits will be returned to the Debtor.

*Note H – Wind-down Costs (Costs Associated with Liquidation)*

The liquidation analysis assumes that a scaled down corporate staff would be retained to administer accounts receivable and payroll and to oversee the liquidation process. A staff would also be needed to maintain and close the accounting records and to complete certain administrative tasks including tax forms and records. For purposes of estimating the maximum liquidation value for the Debtor, no incentive payments for employee retention through the chapter 7 liquidation period are assumed to be made.

Chapter 7 trustee fees include those fees associated with the appointment of a chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Trustee fees are calculated at a flat rate of 3% of the total liquidation value, excluding cash, of the Debtor. Chapter 7 professional and legal fees include legal fees expected to be incurred during the liquidation period that are not already deducted from liquidation values. Professional fees are assumed to be an additional 3% of the total liquidation value of the Debtor.

*Note I – DIP Lender Claim*

For purposes of the Liquidation Analysis, management has estimated the DIP Lender claim to be $924,000 in the aggregate, including accrued and unpaid interest through March 31, 2011.

*Note J – Administrative Claims*

For purposes of the Liquidation Analysis, Administrative Claims are estimated to be $982,000 in the aggregate. Administrative claims represent post petition trade claims, post petition accrued employee compensation and benefits, post petition sales and use taxes and general post petition accrued expenses. The professional fees are included, and assumed to be paid, as part of the DIP claim referenced in Note I.

*Note K- Priority Claims*

For purposes of the Liquidation Analysis, Priority Claims are estimated to be $80,000 in the aggregate. Priority Non Tax Claims are related to employee claims and represent an estimated $30,000. Priority Tax Claims are estimated at $50,000 and represent estimated pre-petition sales and use tax.

*Note L – General Unsecured Claims*

For purposes of the Liquidation Analysis, management has assumed that unsecured claims will consist of the Debtors' accounts payable as of the Petition Date and certain proofs of claim, less any amounts entitled to priority under the Bankruptcy Code. Additional amounts have been included to reflect rejection damages under certain leases. We have not made provisions for any other claims that might arise in the event of a liquidation. For purposes of the liquidation analysis, Unsecured Claims are estimated to be $8.9 million and are inclusive of prepetition accounts payable claims, deferred subscription revenue, intercompany payables, employee benefits and compensation, equipment and real property lease rejection damage claims, retirement benefits, deferred rent liability, interest penalty and other deferred revenue. Under the "High" liquidation scenario, Green Markets and G2 are assumed to be sold on an expedited basis as going concerns, and as such, the Deferred Subscription Revenue for these catalogs, $1.8 million, would be fully assumed by the acquirer.

# APPENDIX D

# WATERFALL RECOVERY ANALYSIS

| | Proposed Plan Value | | Going-Concern Valuation Low | | High | | Liquidation Low | | High | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Consideration | $ 9,495 | | $ 6,397 | | $ 6,508 | | $ 998 | | $ 3,787 | |
| Cash Consideration | $ 1,500 | | $ 1,056 | | $ 1,167 | | $ 998 | | $ 1,992 | |
| Assumed Satisfied Liabilities | $ 7,995 | | $ 5,341 | | $ 5,341 | | $ - | | $ 1,795 | |

| Waterfall | Claim | Recovery $ | % | Claim | Recovery $ | % | Recovery $ | % | Claim | Recovery $ | % | Recovery $ | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIP/(Excess Cash) | $ 1,224 (1) | 1,224 | 100.0% | 1,349 (11) | 1,056 | 78.3% | 1,167 | 86.5% | 924 (13) | 924 | 100.0% | 924 | 100.0% |
| Post Petition Administration Claims | 982 (2) | 982 | 100.0% | 982 | - | 0.0% | - | 0.0% | 982 | 74 | 7.5% | 982 | 100.0% |
| Priority Non Tax Claims | 30 (3) | 30 | 100.0% | 30 | - | 0.0% | - | 0.0% | 30 | - | 0.0% | 30 | 100.0% |
| Priority Tax Claims | 50 | 50 | 100.0% | 50 | - | 0.0% | - | 0.0% | 50 | - | 0.0% | 50 | 100.0% |
| Trade Vendors | 100 (4) | 50 | 50.0% (7) | - | - | NA | - | NA | - | - | NA | - | NA |
| **General Unsecured/Intercompany Claims** | | | | | | | | | | | | | |
| Deferred Subscription Revenue | 4,538 (4) | 4,538 | 100.0% (8) | 4,538 | 4,538 | 100.0% (12) | 4,538 | 100.0% (12) | 4,538 | - | 0.0% | 1,798 | 39.6% (14) |
| Other Deferred Revenue | 803 (4) | 803 | 100.0% (8) | 803 | 803 | 100.0% (12) | 803 | 100.0% (12) | 803 | - | 0.0% | 1 | 0.1% |
| BNA Intercompany Payable | 2,654 (5) | 2,654 | 100.0% (9) | 2,654 | - | 0.0% | - | 0.0% | 2,654 | - | 0.0% | 3 | 0.1% |
| Other Intercompany Payables | 54 (5) | 10 | 19.2% (9) | 54 | - | 0.0% | - | 0.0% | 54 | - | 0.0% | 0 | 0.1% |
| Pre-Petition Accounts Payable & Accrued Expenses (net of trade) | 255 (4) | 49 | 19.2% (10) | 355 | - | 0.0% | - | 0.0% | 355 | - | 0.0% | 0 | 0.1% |
| Post Retirement Benefits | 143 (4) | 27 | 19.2% (10) | 143 | - | 0.0% | - | 0.0% | 143 | - | 0.0% | 0 | 0.1% |
| Deferred Rent Liability | 13 (4) | 2 | 19.2% (10) | 13 | - | 0.0% | - | 0.0% | 13 | - | 0.0% | 0 | 0.1% |
| Interest/Penalty | 3 (4) | 1 | 19.2% (10) | 3 | - | 0.0% | - | 0.0% | 3 | - | 0.0% | 0 | 0.1% |
| Lease Rejection Claims | 294 (6) | 56 | 19.2% (10) | 294 | - | 0.0% | - | 0.0% | 294 | - | 0.0% | 0 | 0.1% |
| **Total Claims/Recovery** | $ 11,143 | $ 10,477 | 94.0% | $ 11,268 | $ 6,397 | 56.8% | $ 6,508 | 57.8% | $ 10,843 | 998 | 9.2% | 3,787 | 34.9% |

(1) Forecasted DIP balance as of March 31, 2011, including $150,000 in professional fees for DIP lender
(2) Post Petition accounts payable, accrued expenses, sales and use tax and employee compensation and benefits payable
(3) Employee related claims
(4) Management estimate of pre-petition critical trade vendors
(3) Management estimate for March 31, 2011
(5) Balance as s of November 6, 2010
(5) Estimated claim as of filing date
(6) Management estimate based on lease documentation
(7) In the proposed Plan of Reorganization, Trade Vendors who have executed an agreement to continue to supply the Debtor will be paid $0.50 for each $1.00 claim
(8) 100% of claim assumed in the Plan of Reorganization
(9) All intercompany amounts outstanding are considered satisfied as part of the Plan of Reorganization.
(10) Based on DIP of $1.5MM and March 31st estimated balance of $1.224MM, $146K is projected to be available to distribute among the General Unsecured Creditors as a part of the Plan of Reorganization after the payment of Priority Tax/Non Tax items and the allocation for Trade Vendors.
(11) Projected DIP balance on March 31, 2011, plus $125,000 DIP Fee in the event of an "Alternative Transaction".
(12) An "Alternative Transaction" is assumed to include the assumption of all Deferred Subscription Revenues for the businesses.
(13) Projected DIP balance on March 31, 2011, less $300,000 SSG success fee, which is not applicable in a liquidation scenario.
(14) In the "High Scenario" for the Liquidation Analysis, the Green Markets and G2 business units are assumed to be sold on an expedited basis and $1.795MM of Deferred Subscription Revenue would be assumed by the buyer. The recovery on the "shortfall of $2,743 is $16.

# APPENDIX E

# VALUATION OF REORGANIZED DEBTOR

# Valuation

(a) *Overview*

At the Debtor's request, SSG has prepared an estimated going concern value for the Reorganized Debtor (the "**Valuation**"). In preparing the Valuation, SSG: (a) reviewed certain historical financial information of the Debtor for recent years and interim periods; (b) reviewed certain internal financial operating data for the Debtor, including the Financial Projections; (c) met with certain members of Management to discuss the Debtor's operations and future prospects; (d) reviewed the Financial Projections prepared by the Debtor; (e) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtor; (f) reviewed publicly available financial data and values of precedent transactions deemed generally comparable to the operating business of the Debtor; (g) considered certain economic and industry information relevant to the Debtor's operating business; and (h) visited certain of the Debtor's facilities.

Although SSG conducted a review and analysis of the Debtor's business, operating assets and liabilities, and business plan, SSG assumed and relied on, without independent verification, the accuracy and completeness of all: (a) financial and other information furnished to it by or on behalf of the Debtor, including, but not limited to, the Financial Projections; and (b) publicly available information. SSG assumed that the Financial Projections were prepared reasonably and in good faith on a basis reflecting the Debtor's best estimates and judgment as to future operating and financial performance. SSG did not conduct an independent evaluation or appraisal of the Debtor's assets, and no independent evaluations or appraisals of the Debtor's assets were sought or were obtained in connection with the preparation of the Valuation.

SSG estimates the Reorganized Debtor's enterprise value to be between approximately **$1.1** million and **$1.2** million as of an assumed Effective Date of March 31, 2011 (the "**Estimated Reorganized Enterprise Value**"). The Estimated Reorganized Enterprise Value reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty as of today regarding the Reorganized Debtor's ability to achieve the Financial Projections, which are set forth in Appendix B to the Disclosure Statement. The Valuation and the Estimated Reorganized Enterprise Value do not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the terms of the Plan or of the terms and conditions of the Plan.

The range of the Estimated Reorganized Enterprise Value, as of an Effective Date of March 31, 2011, reflects work performed by SSG on the basis of information available to, and analyses undertaken by, SSG as of December 27, 2010. It should be understood that, although subsequent developments may affect SSG' conclusions, SSG does not have any obligation to update, revise or reaffirm its estimate.

(b) *Methodology*

In performing its analysis, SSG used various valuation techniques, including: (a) a comparable company analysis, in which SSG analyzed the enterprise values of public companies that SSG

deemed generally comparable to all or parts of the Debtor's operating businesses as a multiple of certain financial measures, including earnings before interest, taxes, depreciation and amortization ("**EBITDA**"), then applied selected multiples derived from such analysis to the projected 2010 EBITDA of the Debtor; (b) a precedent transactions analysis, in which SSG analyzed the financial terms of certain acquisitions of companies that SSG believed were comparable to all or parts of the Debtor's operating business, and then applied certain financial performance and other metrics provided by such analysis to the relevant metrics of the Debtor; and (c) a discounted cash flow analysis, in which SSG, using a weighted average cost of capital, computed the present value of free cash flows from the Debtor and the terminal value of the Debtor.

(i) Comparable Company Analysis

The comparable company valuation analysis is based on the enterprise values of companies that have operating and financial characteristics similar to the Reorganized Debtor. A key factor to this approach is the selection of companies with business and operational characteristics relatively similar to those of the Reorganized Debtor. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size, scale and profitability of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

SSG calculated market multiples based on 2010 estimated EBITDA by dividing the enterprise value of each comparable company by the latest twelve months ("**LTM**") EBITDA, respectively. In determining the applicable EBITDA multiple range, SSG considered a variety of factors, including both qualitative attributes and quantitative measures, such as historical and projected revenue, EBITDA, capital expenditures, EBITDA margins, size, growth and similarity in business lines. Additionally, SSG elected to apply a discount to the valuation multiple derived from the comparable publicly traded companies related to the Debtor's relative lack of liquidity and lack of liquid secondary market for the Debtor's common stock.

(ii) Precedent Transaction Analysis

As it did with the comparable company analysis, SSG focused its analysis under this methodology mainly on EBITDA multiples in comparing the valuations of the Reorganized Debtor and the selected comparable companies. Other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including: (i) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (ii) the market environment is not identical for transactions occurring at different periods of time; and (iii) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for, and circumstances surrounding, each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each target. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information. As described above, the precedent transaction analysis explains other aspects of value besides the inherent value of a company. As a result of the significant limitations as to the usefulness of this methodology, SSG' reliance on the precedent transaction analysis in determining the Estimated Reorganized Enterprise Value was minimal.

In deriving a range of enterprise values for the Reorganized Debtor under this methodology, SSG calculated multiples of total transaction value ("**Transaction Value**") to the LTM EBITDA and of the acquired companies and applied these multiples to the Reorganized Debtor. SSG evaluated various merger and acquisition transactions that have occurred in the publishing industry over the last six years. Over the past two years there have been a limited number of precedent transactions, and for those that are relevant, limited financial information was disclosed. In addition, many of the transactions that have occurred over the past six years have been executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace. These considerations reduce the relevance of the precedent transaction analysis.

SSG reviewed and considered the results of SSG's efforts to solicit indications of interest and definitive proposals from third parties with respect to an acquisition of Thompson Publishing Holding Co., Inc. ("**Thompson**") as part of a sale process done in July and August of 2010. SSG believes that Thompson's operating business is similar to the Reorganized Debtor's and therefore valuation information from the Thompson sale process is relevant to the valuation of the Reorganized Debtor. SSG used the proposed transaction values set forth by potential acquirers as a multiple of Thompson's projected 2010 EBITDA to arrive at a relevant valuation multiple for the Precedent Transaction Analysis for the Reorganized Debtor.

(iii) Discounted Cash Flow

The discounted cash flow ("**DCF**") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "**Discount Rate**"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its targeted long-term capital structure. The enterprise value of the firm is determined by calculating the present value of the Reorganized Debtor's unlevered after-tax free cash flows based on the Financial Projections. The terminal value was derived by using the Gordon Growth Model to the cash flow

in the final projected year of the projection period, discounted back to the assumed date of emergence by the Discount Rate.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation nonetheless involves complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtor, which in turn affect their cost of capital and terminal multiples.

(c) *Summary*

The summary set forth above does not purport to be a complete description of the analyses performed by SSG. An estimate of total enterprise value is not entirely mathematical, but rather it involves complex considerations and judgments concerning various factors that could affect the value of an operating business. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the Estimated Reorganized Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties and contingencies beyond the control of the Debtor and the Reorganized Debtor, neither the Debtor, the Reorganized Debtor, SSG nor any other person assumes their accuracy. Depending on the results of the Debtor's operations or changes in the financial markets, the enterprise value of the Reorganized Debtor's businesses as a going concern as of the Effective Date may differ from the Estimated Reorganized Enterprise Value set forth herein. In addition, this Valuation does not purport to be an appraisal, nor does it necessarily reflect the values that might be realized if the Debtor's assets were sold.

The foregoing Valuation reflects a number of assumptions, including a successful reorganization of the Debtor's business and debt obligations in a timely manner, achieving the forecasts reflected in the Financial Projections, the amount of available cash, market conditions, the availability of certain tax attributes and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. The estimates of value represent a hypothetical enterprise value of the Reorganized Debtor as the continuing operator of its business and assets and assume that such assets are operated in accordance with the Debtor's business plan. They do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the trading value or sale of any securities to be issued pursuant to the Plan, which may be significantly different from the other amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. Moreover, to the extent that the estimated range of enterprise value is dependent upon the Debtor's achievement of the Financial Projections, it is inherently speculative.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT

UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTOR OR THE REORGANIZED DEBTOR. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ESTIMATED REORGANIZED ENTERPRISE VALUE REFLECTED IN THIS VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE ESTIMATED REORGANIZED ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS SET FORTH IN THE DEBTOR'S FINANCIAL PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH IS GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTOR'S CONTROL, AS FURTHER DISCUSSED IN THIS DISCLOSURE STATEMENT.

THE CALCULATIONS OF ESTIMATED REORGANIZED ENTERPRISE VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUE AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE ESTIMATED REORGANIZED ENTERPRISE VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POSTREORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE ESTIMATED REORGANIZED ENTERPRISE VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN BY SSG FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATIONS ARE ASSUMED TO REVISE THIS CALCULATION OF THE DEBTOR'S OR THE REORGANIZED DEBTOR'S VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR. THIS VALUATION DOES NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

**BNA**
**Valuation Summary**
*($ in thousands)*

| | Revenue | Median Revenue Multiple | EBITDA | Median EBITDA Multiple | Valuation | | Illiquidity Discount | Adjusted Valuation | | Weight | Weighted Valuation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Low | High | | Low | High | | Low | High |
| Discounted Cash Flow | | | | | 1,270.86 | 1,404.63 | 0% | 1,270.86 | 1,404.63 | 70.0% | 889.60 | 983.24 |
| Comparable Public Companies | 13,890.36 | 2.05x | 106.78 | 10.6x | 1,074.37 | 1,187.46 | 27% | 784.29 | 866.85 | 5.0% | 39.21 | 43.34 |
| Comparable Transactions | 13,890.36 | 1.78x | 106.78 | 5.0x | 507.20 | 560.59 | 0% | 507.20 | 560.59 | 25.0% | 126.80 | 140.15 |
| **Valuation** | | | | | | | | | | | **$1,055.62** | **$1,166.73** |